## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY; WILDERNESS WATCH; ENVIRONMENTAL ACTION COMMITTEE OF WEST MARIN; MARIN CONSERVATION LEAGUE; SAVE OUR SEASHORE; AMY MEYER; PHYLLIS KOENIG; and DAVID PEREL, 962 Wayne Ave., Suite 610 Silver Spring, MD 20910 *Plaintiffs*, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Civil Action No. 19-3629 |
| v. | ) ) ) | **COMPLAINT** |
| NATIONAL PARK SERVICE; DEPARTMENT OF THE INTERIOR; P. DANIEL SMITH, in his official capacity; DAVID VELA, in his official capacity; and DAVID BERNHARDT, in his official capacity, 1849 C Street, N.W. Washington, D.C. 20240 *Defendants.* | ) ) ) ) ) ) ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     Plaintiffs bring this action for declaratory and injunctive relief to prohibit the Defendant officials in the U.S. Department of the Interior from allowing motorized electric bicycles ("e-bikes") within the National Park System without first going through the rule-making and environmental impact assessment steps that required by federal law.

1

2.      E-bike use in the National Park System creates qualitatively new risks, such as high speeds, increased likelihood of collisions compared to non-motorized bicycles, and the startling and disturbance of hikers, runners, and horse and traditional bicycle riders. Their use also causes environmental impacts such as increased noise, trail damage, and disturbance of wildlife.

3.      Plaintiffs include five public interest organizations dedicated to conserving the recreational and natural values of one or more units in the National Park System across the United States. One of the Plaintiffs is an organization whose mission is to advocate for public employees, including those who are employed in the Park System where e-bikes are now allowed. Plaintiffs also include three directly-impacted individuals. All of the Plaintiffs, or their members, regularly visit the Park System but find that the use of motorized e-bikes by others either already has disrupted, or foreseeably will disrupt, their own use and enjoyment of the System.

4.      The Defendants' actions that approved e-bike use throughout the National Park System without first amending the existing National Park Service (NPS) regulations defining and governing bicycle use, at 36 C.F.R. §§ 1.4 and 4.30, violated those regulations and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* Further, Defendants' actions violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, as well as NEPA's implementing regulations, because the Defendants failed to prepare either an environmental impact statement ("EIS") or an environmental assessment ("EA") for the actions. Further, the Defendants violated the Federal Advisory Committee Act ("FACA"), (5 U.S.C. App'x.), when they promulgated the e-bikes policies at issue based on many months of deliberations in a non-FACA compliant advisory committee involving multiple private industry representatives who promoted the e-bike policies at issue.

5.     Additionally, Defendants Smith and Vela's actions allowing e-bikes in the National Park System violated the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. §§ 3345-3349d, because they purported to be "exercising the authority of the Director," despite neither having been confirmed as the NPS Director by the United States Senate nor appointed by President Trump as the "acting" NPS Director. Further, the Deputy Director position that Defendant Smith purported to occupy in the NPS had been created by Defendant Bernhardt in violation of the NPS Organic Act, 54 U.S.C. § 100302.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and the Declaratory Judgment Act, 28 U.S.C. § 2201.

7.     This Court has the authority to award costs, expenses, and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d).

8.     Venue is properly vested in this court under 28 U.S.C. § 1391(e) because the Defendants reside in this district, one Plaintiff is incorporated in this district, and because a substantial part of the acts and omissions giving rise to this suit occurred in this district.

## PARTIES AND STANDING

9.     Plaintiff PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY ("PEER") is a nonprofit organization incorporated in the District of Columbia and headquartered in Silver Spring, MD. It is a national alliance of local, state and federal resource professionals. PEER works nationwide with government scientists, land managers, environmental law enforcement agents, rangers, and other resource professionals committed to responsible management of America's public resources, including National Parks and other public lands. PEER's officers and members include individuals who have observed e-bikes and are aware of

3

their impacts, including their higher risk of collisions than traditional bikes. The increased riskiness and noise of e-bikes, including resulting harm to wildlife and other environmental damage, reduces the enjoyment of PEER's officers and members within the Park System units in which they are now allowed because of the new NPS e-bikes policy. This has a negative impact on them both physically and emotionally.

10.     PEER's officers and members also are harmed by the Defendants' past and ongoing violations of FACA, in that they would have participated and commented in the advisory committee that was created for e-bikes in Washington, DC, if they had received the FACA-mandated public notices of the meetings in the Federal Register. Further, PEER and its officers and members also are harmed by the Defendants' past and ongoing violations of FVRA because PEER has a strong interest in ensuring that its member NPS employees serve under a properly Senate-confirmed or otherwise FVRA-compliant Director, particularly here with respect to the new e-bikes policy. PEER has a long history of advocacy, education and other engagement regarding the Department of the Interior's ongoing FVRA violations, particularly those involving Defendants Bernhardt, Smith, and Vela.

11.     Plaintiff WILDERNESS WATCH is a Missoula, MT, based nonprofit organization with satellite offices in Idaho and Minnesota. Wilderness Watch focuses on the preservation and proper stewardship of lands and rivers included in the National Wilderness Preservation System. It is committed to citizen oversight, public education, and legal and legislative action to protect America's wilderness. Wilderness Watch is a membership organization, with chapters in Alaska, Wyoming, and Georgia and members in virtually every state. Wilderness Watch's officers and members include individuals who have observed e-bikes and are aware of their impacts, including their clearly higher risk of collisions and disturbance than traditional bikes. The increased riskiness

and noise of e-bikes, including resulting harm to wildlife and other environmental damage to designated and proposed wilderness areas, reduces the enjoyment of Wilderness Watch' members in the Park System units in which e-bikes are now newly allowed, which has a negative impact on them both physically and emotionally.

12.     Plaintiff MARIN CONSERVATION LEAGUE (MCL) is a non-profit member-based conservation organization located in San Rafael, CA, founded in 1934 for the purpose of preserving, protecting, and enhancing the natural assets of Marin County. MCL was either instrumental or a major collaborator in the acquisition of many of Marin's scenic and natural resource lands for public enjoyment. These include two National Park units, Point Reyes National Seashore and Golden Gate National Recreation Area (GGNRA). In the years since the founding of these parks, MCL has participated in numerous public processes and, in so doing, helped guide many of the parks' planning decisions. MCL's members enjoy hiking, horseback riding, conventional mountain biking, and nature-watching in both parks. Members report an increasing number of e-bikes on the natural surface roads and trails of GGNRA. Their addition exacerbates an existing safety issue for slower visitors on foot or horseback. E-bikes can achieve and exceed speeds of 20 miles per hour and often do so in spite of blind corners and the presence of other visitors. E-bikers can travel uphill at speeds double the speed of a physically fit conventional bicyclist. In all cases, the speed capability of e-bikes adds to the potential for collision, or, at a minimum, for near-misses and loss of a sense of tranquility for slower hikers, bikers, and equestrians. This has the negative impact of displacing MCL members and the public from trails that they currently enjoy. Both parks have a long history as popular destinations for equestrians, whose safety and security are at particular risk from fast moving e-bikes. MCL members also are concerned that the proximity of e-bike rental facilities to GGNRA enables less skilled e-cyclists

to ride on roads and trails, potentially compromising safety and security sought by hikers and equestrians. Finally, MCL members are concerned that the addition of e-bikes increases the potential disturbance and risk of death to slow-moving and small wildlife as they attempt to cross roads and trails within their territory.

13.     Plaintiff ENVIRONMENTAL ACTION COMMITTEE OF WEST MARIN (EAC), is an environmental nonprofit organization located in Point Reyes Station, CA. EAC is engaged in the protection of West Marin's unique lands, waters, and biodiversity through advocacy, engagement, and education. EAC focuses on environmental threats facing the unincorporated coastal communities of West Marin, in particular in the Point Reyes National Seashore, in which e-bikes are now newly allowed. EAC's officers and members are aware of e-bikes and their impacts, including their higher risk of collisions than traditional bikes. The increased riskiness and noise of e-bikes in the Point Reyes National Seashore, including resulting harm to wildlife and other environmental damage, reduces the enjoyment of the National Seashore by EAC's members, which has a negative impact on them physically and emotionally.

14.     Plaintiff SAVE OUR SEASHORE (SOS) is a Marin County, CA, based nonprofit organization. SOS protects Marin County's oceans, coasts, estuaries, watersheds, creeks, and parks. It focuses on protecting the environment and wildlife within Marin's many ecosystems, including within the GGNRA and Point Reyes National Seashore, in which e-bikes are newly allowed. SOS has been extensively involved in numerous planning processes, including Marin County's Countywide Plan, Muir Woods National Monument Trail Project, and Point Reyes National Seashore's General Management Plan Amendment. Its officers and members have observed e-bikes, are aware of their riskiness and elevated noise levels, and are concerned about the safety of allowing e-bikes to remain on trails. The safety hazards, as well as the environmental

damage and harm to wildlife, reduce the enjoyment of SOS's members, which has a negative impact on them both physically and emotionally.

15.     Plaintiff AMY MEYER is an artist and long-time conservation advocate who resides in San Francisco, CA. Beginning 49 years ago, in 1970, she co-organized and then co-chaired the People For a Golden Gate National Recreation Area (GGNRA). Working with other park advocates, they saved the sweeping expanses of the headlands of the Golden Gate for public use in perpetuity. She has been heavily involved in the National Park System's GGNRA, now expanded to encompass 80,000 acres, ever since. She has visited countless times, and enjoys walking, hiking, photography, and enjoying nature, as well as enjoying watching others enjoy the preserve that she helped create. The use of noisier and higher speed e-bikes threatens her enjoyment of the GGNRA. They present dangers to her use of the trails because of their clearly higher risk of collisions. She is 86 years old and does not have quick reflexes to avoid such collisions.

16.     Plaintiffs PHYLLIS KOENIG and DAVID PEREL are a married couple residing in New Brunswick, NJ. Beginning 25 years ago, they now have an annual tradition of vacationing for two weeks in Acadia National Park in Maine. For almost every summer since they have used and enjoyed Acadia. Their main activities in Acadia are bicycling, hiking, camping, and enjoying nature. They have extensive experience with e-bikes on trails in and near New York City and elsewhere. The newly-allowed use of e-bikes now threatens their enjoyment of Acadia, particularly because they are allowed on the renowned old "carriage roads," extending over 40 miles, which have served primarily as bicycling, hiking, running, and equestrian paths. Phyllis and David know that e-bikes can exceed speeds of 20 miles per hour including up hills and around tight turns which, coupled with their greater weight than regular bicycles, creates a high risk of a dangerous collision.

This presents dangers to their own bicycling and walking on the carriage roads of Acadia. They also are concerned about e-bikes' other environmental impacts, such as noise and habitat damage.

17.     All of the Plaintiffs also were impacted by the improper rulemaking that the Defendants undertook without compliance with the APA or NEPA. These violations denied the Plaintiffs and their members, as applicable, the ability to submit public comments during the APA and NEPA processes opposing e-bikes deregulation and emphasizing their harmful environmental impacts.

18.     Defendants NATIONAL PARK SERVICE and DEPARTMENT OF THE INTERIOR are agencies of the United States responsible for the National Park System and for implementing the e-bike deregulation actions at issue in this suit.

    a.  Defendant P. DANIEL SMITH, sued in his former official capacity as Deputy Director of the NPS, promulgated the NPS e-bike deregulation actions at issue.

    b.  Defendant DAVID VELA, sued in his current official capacity as Deputy Director of the NPS, is further promulgating and implementing the e-bike deregulation actions at issue.

    c.  Defendant DAVID BERNHARDT, sued in his official capacity as Secretary of the Interior, is responsible for the Department of the Interior and its bureaus, including the NPS; further, he carried out the violations of FACA, FVRA and the NPS Organic Act at issue in this suit.

## STATUTORY AND REGULATORY BACKGROUND

**<u>Administrative Procedure Act</u>**

19.     The APA confers a right of judicial review on any person that is adversely affected by an "agency action". 5 U.S.C. § 702. Upon review, the court shall "(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency actions, findings, and conclusions found to be– (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law". *Id.* at § 706(2).Under 5 U.S.C. §551(13) "agency action" is defined as "the whole or a part of an agency **rule**, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act". (emphasis added). A "rule" is defined in §551(4) as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing".

### National Environmental Policy Act

20.     NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1. Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," *id.* at § 1500.1(c), and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* at § 1500.1(b).

21.     To accomplish these purposes, NEPA provides that a Federal agency must prepare an EIS for "proposals for…major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.3. The Council on Environmental Quality regulations list a number of factors that an agency must consider in deciding whether to prepare an EIS. 40 C.F.R. § 1508.27. The agency must prepare the EIS or otherwise comply with NEPA *before* going forward with an action. Moreover, actions subject to NEPA "include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action." 40 C.F.R. § 1508.18.

22.     The NEPA process requires the acting agency to first determine whether the action is one that normally requires an EIS. 40 C.F.R. § 1501.4(a)(1). An agency action does not normally require an EIS if it falls within a categorical exclusion. *Id.* § 1501.4(a)(2). "Categorical exclusion" is defined as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. § 1508.4. If an agency determines that the action is not the kind that normally requires an EIS and does not invoke a categorical exclusion, the agency is required to prepare an EA to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1501.4(b), 1508.9. If the agency concludes, based on the EA, that an EIS is not required, it must prepare a finding of no significant impact, which explains the agency's reasons for its decision. *Id.* §§ 1501.4(e), 1508.13**.**

**Federal Vacancies Reform Act**

23.     FVRA, 5 U.S.C. §§ 3345-3349d, generally provides the exclusive means by which a government employee may temporarily perform the nondelegable functions and duties of a

vacant position in an executive agency that requires Senate confirmation after "advice and consent" under Art. II, section 2 of the United States Constitution. FVRA limits a government employee's ability to serve as an acting officer in two primary ways. Section 3345(a) on "acting" officials provides that three classes of people may serve temporarily in an "advice and consent" position. As a default rule, the "first assistant" to a position automatically becomes the acting officer. Alternatively, the President may direct either a different senior official of that agency or a person serving in any other advice and consent position to serve as the "acting" officer. FVRA also limits the length of time a person may serve as acting officer, generally for up to 210 days, *Id.* § 3346.

24.     FVRA forbids lower unconfirmed officials who are not properly "acting" under §3345(a) from occupying offices that require Senate confirmation. 5 U.S.C. § 3348(b), provides in subsections (b)(1) and (2) that in the absence of a confirmed or properly-appointed acting official "the office shall remain vacant; and…only the head of such Executive agency may perform any function or duty of such office". Section 3348 also provides in subsections (d)(1) and (2) that such actions by unconfirmed lower officials "shall have no force or effect" and "may not be ratified".

## Federal Advisory Committee Act

25.     FACA governs the operation of federal advisory committees and emphasizes public involvement through open meetings and reporting. It defines "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group…which is…(C) established or utilized by one or more agencies, in the interest of obtaining advice or recommendations…." 5 U.S.C. App. § 3(2) (in pertinent part). Except in certain statutorily defined circumstances, all FACA committee meetings must be announced in the Federal

Register and open to the public. *Id.* at § 10. Reports, transcripts, working papers, and other materials made available to or prepared for or by the committees must be made available to the public. *Id.*

### NPS Organic Act

26.     The NPS Organic Act, 54 U.S.C. § 100302, in pertinent part provides:

*Directors and other employees.*
*(a) Director.—(1)Appointment.—The Service shall be under the charge of a director who shall be appointed by the President, by and with the advice and consent of the Senate.*
*(b)Deputy Directors.—*
*The Director shall select 2 Deputy Directors. One Deputy Director shall have responsibility for Service operations, and the other Deputy Director shall have responsibility for other programs assigned to the Service.*

### NPS Regulations on Bicycles

27.     NPS regulation 36 C.F.R. § 1.4 "What terms do I need to know?," provides (in pertinent part):

(*a) The following definitions shall apply to this chapter, unless modified by the definitions for a specific part or regulation: ....*
        *Bicycle means every device propelled solely by human power upon which a person or persons may ride on land, having one, two, or more wheels, except a manual wheelchair.*

28.     36 C.F.R. § 4.30 on bicycle use provides:

***(a) Park roads.*** *The use of a bicycle is permitted on park roads and in parking areas that are otherwise open for motor vehicle use by the general public.0*
***(b) Administrative roads***. *Administrative roads are roads that are closed to motor vehicle use by the public, but open to motor vehicle use for administrative purposes. The superintendent may authorize bicycle use on an administrative road. Before authorizing bicycle use on an administrative road the superintendent must: (1) Make a written determination that such bicycle use is consistent with protection of the park area's natural, scenic and aesthetic values, safety considerations and management objectives, and will not disturb wildlife or park resources; and (2) Notify the public through one or more methods listed in § 1.7(a) of this chapter.*

12

*(c) [Reserved]*

*(d) **Existing trails.** The superintendent may authorize by designation bicycle use on a hiking or horse trail that currently exists on the ground and does not require any construction or significant modification to accommodate bicycles. Before doing so, the superintendent must ensure that all of the following requirements have been satisfied:(1) The superintendent must complete a park planning document that addresses bicycle use on the specific trail and that includes an evaluation of: (i) The suitability of the trail surface and soil conditions for accommodating bicycle use. The evaluation must include any maintenance, minor rehabilitation or armoring that is necessary to upgrade the trail to sustainable condition; and (ii) Life cycle maintenance costs, safety considerations, methods to prevent or minimize user conflict, methods to protect natural and cultural resources and mitigate impacts, and integration with commercial services and alternative transportation systems (if applicable).*

*(2) The superintendent must complete either an environmental assessment (EA) or an environmental impact statement (EIS) evaluating the effects of bicycle use in the park and on the specific trail. The superintendent must provide the public with notice of the availability of the EA and at least 30 days to review and comment on an EA completed under this section. (3) The superintendent must complete a written determination stating that the addition of bicycle use on the existing hiking or horse trail is consistent with the protection of the park area's natural, scenic and aesthetic values, safety considerations and management objectives, and will not disturb wildlife or park resources.(4) (i) If under paragraph (d)(2) of this section, the resulting Finding of No Significant Impact, Record of Decision (ROD), or an amended ROD concludes that bicycle use on the specific trail will have no significant impacts, the superintendent must publish a notice in the Federal Register providing the public at least 30 days to review and comment on the written determination required by paragraph (d)(3) of this section. After consideration of the comments submitted, the superintendent must obtain the Regional Director's written approval of the determination required by paragraph (d)(3) of this section; or(ii) If under paragraph (d)(2) of this section, the conclusion is that bicycle use on the specific trail may have a significant impact, the superintendent with the concurrence of the Regional Director must complete a concise written statement for inclusion in the project files that bicycle use cannot be authorized on the specific trail.*

*(e) **New trails.** This paragraph applies to new trails that do not exist on the ground and therefore would require trail construction activities (such as clearing brush, cutting trees, excavation, or surface treatment). New trails shall be developed and constructed in accordance with appropriate NPS sustainable trail design principles and guidelines. The superintendent may develop, construct, and authorize new trails for bicycle use after:(1) In a developed area, the superintendent completes the requirements in paragraphs (d)(1) through (d)(3) of this section, publishes a notice in the Federal Register providing the public at least 30 days to review and comment on the written determination required by paragraph (d)(3) of this section, and after consideration of the comments submitted, obtains the Regional Director's written approval of the*

*determination required by paragraph (d)(3) of this section; or (2) Outside of a developed area, the superintendent completes the requirements in paragraphs (d)(1), (2), and (3) of this section; obtains the Regional Director's written approval of the determination required by paragraph (d)(3) of this section; and promulgates a special regulation authorizing the bicycle use.*

*(f) Closures and other use restrictions. A superintendent may limit or restrict or impose conditions on bicycle use or may close any park road, parking area, administrative road, trail, or portion thereof to bicycle use, or terminate such condition, closure, limit or restriction after: (1) Taking into consideration public health and safety, natural and cultural resource protection, and other management activities and objectives; and (2) Notifying the public through one or more methods listed in § 1.7(a) of this chapter.*

*(g) Other requirements.*

*(1) A person operating a bicycle on any park road, parking area, administrative road or designated trail is subject to all sections of this part that apply to an operator of a motor vehicle, except §§ 4.4, 4.10, 4.11, 4.14, and 4.15.*

*(2) Unless specifically addressed by regulations in this chapter, the use of a bicycle within a park area is governed by State law. State law concerning bicycle use that is now or may later be in effect is adopted and made a part of this section.*

*(h) Prohibited acts. The following are prohibited: (1) Bicycle riding off of park roads and parking areas, except on administrative roads and trails that have been authorized for bicycle use. (2) Possessing a bicycle in a wilderness area established by Federal statute. (3) Operating a bicycle during periods of low visibility, or while traveling through a tunnel, or between sunset and sunrise, without exhibiting on the operator or bicycle a white light or reflector that is visible from a distance of at least 500 feet to the front and with a red light or reflector that is visible from at least 200 feet to the rear. (4) Operating a bicycle abreast of another bicycle except where authorized by the superintendent. (5) Operating a bicycle while consuming an alcoholic beverage or carrying in hand an open container of an alcoholic beverage. (6) Any violation of State law adopted by this section.*

## FACTS

### E-bikes and their Impacts on Plaintiffs

29.     E-bikes are vehicles that include both an electric motor and pedals for pedaling. E-bikes may be powered by the motor (some types have handlebar throttles), the pedals, or both simultaneously. The motors may generate one hundred percent of the power going to the wheels and they are capable of reaching 20 miles per hour or faster with minimal pedaling. The motors in e-bikes allow riders to travel faster and further with less exertion over time than by pedaling alone.

30.     Equestrian riders, backpackers, hikers, trail runners, and mountain bike riders—including Plaintiffs and their members—seek out non-motorized trails in the National Park System to get away from fast-moving motorized vehicles and enjoy a quiet, natural environment. The use of e-bikes on non-motorized trails harms the ability of other Park visitors, including Plaintiffs and their members, to enjoy peaceful and safe surroundings undisturbed by faster-moving, typically noisier, motorized vehicles.

31.     The use of e-bikes on non-motorized trails puts Plaintiffs at risk of higher-speed and more dangerous collisions, thus it causes them to avoid or reduce their use of National Park trails that Defendants have newly-opened to e-bike use. E-bikes also pose other significant environmental impacts that harm Plaintiffs' enjoyment and use of National Parks including, but not necessarily limited to, disturbance of wildlife and trail damage.

### Defendants' Improper Actions Approving E-bikes in National Parks

32.     On Aug. 29, 2019, Defendant Secretary of the Interior David Bernhardt issued Secretarial Order number 3376, entitled "Increasing Recreational Opportunities through the use of Electric Bikes" (hereinafter "the Secretary's Order"). The heart of the Order directs Interior agencies that: "E-bikes shall be allowed where other types of bicycles are allowed". (Sec. 4.b.) Further, the Secretary's Order states that he: "**Instruct[s] the Director, National Park Service (NPS) to develop a proposed rule to revise 36 C.F.R. § 1.4 and any associated regulations to be consistent with this Order, add a definition for e-bikes consistent with 15 U.S.C. § 2085, and expressly exempt all e-bikes as defined in Sec. 4a from the definition of motor vehicles**". (Sec. 5.a)iv); emphasis added.)

15

33.     The NPS definition of "motor vehicle" that the Secretary's Order referred to is in 36 C.F.R. § 1.4: "*Motor vehicle* means every vehicle that is self-propelled and every vehicle that is propelled by electric power, but not operated on rails or upon water, except a snowmobile and a motorized wheelchair." That definition plainly includes e-bikes as they are vehicles "propelled by electric power".

34.     The next day, on Aug. 30, 2019, Deputy NPS Director P. Daniel Smith announced a new directive in the form of Policy Memorandum 19-01 (hereinafter, the "Smith Directive"). It did not "develop a proposed rule to revise 36 CFR § 1.4," such as revising the definition of "motor vehicle" as the Secretary's Order explicitly called for. Instead, Smith directly instructed all Park Superintendents to immediately treat motorized e-bikes to be considered the same as "bicycles" and regulated under the regulation on traditional bicycle use, 36 C.F.R. § 4.30. After citing that regulation, the Smith Directive states that he "requires that these provisions also govern the use of e-bikes so that the use of e-bikes and traditional bicycles are generally regulated in the same manner". (page 3) He states the new NPS "Policy" is that: "E-bikes are allowed where traditional bicycles are allowed." (page 2)

35.     In short, the Smith Directive provides that where any National Park unit had, as of Aug. 30, allowed the use of traditional bicycles, all such Park units must now allow the use of e-bikes. There are a total of 419 Park units, including National Parks, Preserves, Monuments, Recreation Areas, Seashores Historic Sites, Battlefields, and others. The Smith Directive applies to all units in the System that allow any bicycle use. To date, dozens of Park units have issued notices allowing e-bikes and such notices are continuing to issue nationwide.[1]

---

[1] Following is a non-exhaustive list of Park units that have issued online public notices pursuant to the Smith Directive; many of these notices are explicit that the NPS's bicycle use regulation,

36.    The Smith Directive was contrary to his own agency's regulations. In 1983 the NPS adopted its current general regulations, which define a "bicycle" as "...every device **propelled solely by human power** upon which a person or persons may ride on land, having one, two, or more wheels" (emphasis added). 36 C.F.R. § 1.4. Thus, e-bikes are not bicycles as they are propelled by their motors, which may be supplemented with human pedaling.

37.    The NPS through its long history has generally prohibited bicycle use outside of developed zones, that is, on trails within the undeveloped "backcountry". On April 2, 1987, the NPS adopted a regulation at 36 C.F.R. § 4.30 governing the use of "Bicycles" in the System. The 1987 regulation provides that "[T]he use of bicycles is prohibited except on park roads, in parking areas and on routes designated for bicycle use...". The 1987 regulation imposed a strict standard for designating routes for bicycle use outside of "developed areas". A Park Superintendent could designate such routes only by adoption of a special regulation for that park at 36 C.F.R. Part 7. Designating traditional bicycle routes required extensive preconditions and compliance steps as outlined in 36 C.F.R. § 4.30(d) and (e), *supra,* for existing and new trails, respectively. None of those preconditions and compliance steps were met by the Defendants prior to designating such trails for e-bikes use.

---

36 C.F.R. § 4.30, is now also being applied to e-bikes System-wide: Bryce Canyon National Park, Glacier National Park, Grand Teton National Park, Yellowstone National Park, Acadia National Park, Arches National Park, Canyonlands National Park, Natural Bridges National Monument, Hovenweep National Monument, Wright Brothers National Memorial, John Muir National Historic Site, Eugene O'Neill National Historic Site, City of Rocks National Reserve, Fort Raleigh National Historic Site, Wolf Trap National Park, Rock Creek Park, Craters of the Moon National Monument and Preserve, North Cascades National Park Service Complex, Gettysburg National Military Park and Eisenhower National Historic Site, Olympic National Park, Death Valley National Park, and Capitol Reef National Park. Additions to this list by NPS are continuing.

38.     The following Park units had designated specific routes for bicycle (not e-bike) use by regulation between 1987 and 2012:

36 C.F.R. § 7.11; Saguaro National Park; Cactus Forest Trail, inside the Cactus Forest Loop Drive,
- § 7.36; Mammoth Cave National Park; 17 miles of backcountry trails,
- § 7.90; Chattahoochee River National Recreation Area; nine miles of backcountry trails, and
- § 7.97; Golden Gate National Recreation Area; routes not specified in special regulation but as "designated by the Superintendent". The designated routes open to bicycles extend for hundreds of miles in the Recreation Area and one small section in Muir Woods National Monument.

These are trails that the Smith Directive purports to open immediately to e-bike use by his fiat without amending the regulations cited.

39.     In 2012 the NPS relaxed the 1987 requirements for allowing bicycles on backcountry trails.[2] (The 2012 revision did not alter the definition of "bicycle" in the 1983 regulation, at 36 C.F.R. § 1.4.) That new, and still current, regulation at 36 C.F.R. § 4.30, *supra,* authorizes a Park manager to designate any existing trail in Parks as open to traditional bicycle use by a process of designation per 36 C.F.R. § 1.5, and public notification per § 1.7. It continued to require enhanced planning and environmental compliance procedures and public notice and participation for such designations. The 2012 revision required a special regulation to be promulgated only for bicycle use on newly-constructed bicycle trails. A partial list of the units that have designated trails in backcountry areas for bicycle use under the NPS's 2012 method includes: Big South Fork National River and Recreation Area, Cuyahoga River National Park, Delaware Water Gap National Recreation Area, Point Reyes National Seashore, Redwood National Park,

---

[2] 77 *Fed. Reg.* 39928, Vol. 77, No. 130, Friday, July 6, 2012.

Santa Monica Mountains National Recreation Area; and Whiskeytown National Recreation Area. The list is partial because there is no central location for information on all of the park units in this category. On information and belief, many additional units have been designated by their Superintendents for bicycle use on some or all of their non-motorized trails. The Smith Directive also purports to open all of them immediately to e-bike use by his fiat.

40.     The Defendants did not provide public notice or solicit public comment prior to allowing e-bike use on non-motorized trails in the National Park System. Additionally, they did not conduct any environmental analysis via an EIS or EA pursuant to NEPA, prior to allowing e-bike use.

**Illegal Federal Advisory Committee**

41.     The actions of all the Defendants flowed from a violation of FACA. Beginning in October of 2018 (or earlier, Plaintiffs lack all relevant records), an advisory committee was convened by the Department of the Interior known as the "E-bike Partner & Agency Group" (the "Group"). The Group was hosted by the NPS and other Interior agencies in person at the Main Interior Building at in Washington, DC, and via conference call. It met at least quarterly during the time that Secretary's Order and the Smith Directive on e-bikes were developed. The most recent known Group meeting was Oct. 10, 2019. Participants included numerous Federal agency representatives and private industry representatives who advocated (successfully) for e-bike deregulation by the Department. The private industry advocacy groups included, but were not limited to, People for Bikes (multiple representatives).

42.     The E-bike Partner & Agency Group meetings were neither open to other participants nor announced in the Federal Register. The Group was not fairly representative of the

range of private or public interests affected by e-bike use on NPS land. The Plaintiffs received no information about the existence of this hidden Group before October of 2019.

43.     The NPS intentionally hosted and repeatedly engaged in this non-FACA compliant advisory committee, seeking recommendations from the participants. It very likely led to the issuance of Defendant Bernhardt's Order and the Smith Directive approving e-bikes. Had Plaintiffs known of this Group they would have objected to its meeting and sought FACA compliance for it to exist.

44.     On November 6, 2019, Plaintiff PEER sent letters to Defendants Bernhardt and Vela, to the Offices of General Counsel, and to all known Interior officials who participated in the E-bike Partner & Agency Group. The PEER letters highlighted that the Group was a non-FACA compliant advisory committee and how PEER and other affected interests had been improperly denied the notice and other information required under FACA. PEER urged those officials to withdraw their new e-bike policies developed in the violative advisory committee, but PEER has received no substantive responses to its letters to date.

### Actions by Defendants Bernhardt, Smith and Vela Contrary to FVRA

45.     Then-Secretary of the Interior Ryan Zinke appointed Mr. Smith as "acting" Director" of the NPS on Jan. 24, 2018.[3] However, Mr. Zinke lacked authority under FVRA to make that appointment. Only the President had authority to name an "acting" Director, 5 U.S.C § 3345, and Mr. Smith was never otherwise qualified under that section to accede to the "acting" Director position.

---

[3] NPS News Release, Jan. 24, 2018, "Secretary Zinke Announces Changes in National Park Service Leadership," online at: https://www.nps.gov/orgs/1207/01-24-2018-leadership.htm .

46.     Defendant Bernhardt later began labelling Mr. Smith as Deputy Director and he "redelegated" authority to Mr. Smith to exercise the authority of the NPS Director. The Bernhardt Redelegation Order under which Mr. Smith was functioning on Aug. 30, 2019, when he issued his Directive on e-bikes, was Amendment No. 28, dated July 29.[4]

47.     P. Daniel Smith resigned and David Vela replaced him as Deputy Director of the NPS "exercising the authority of the Director," pursuant to Bernhardt Redelegation Order Amendment No. 29, dated Sept. 30, 2019.[5] Mr. Vela has used that authority to continue to carry out the Smith Directive, including providing additional directives and guidance to Park Superintendents and other NPS officials on implementing the e-bike deregulation policy.

48.     The NPS Director position requires Senate confirmation under the NPS Organic Act, 54 U.S.C. § 100302(a)(1), *supra.* It has never had confirmation, going back nearly three years to the Trump Inauguration on Jan. 20, 2017. The Bernhardt Redelegation Orders by which Mr. Smith and Mr. Vela have been "exercising the authority of" the NPS Director suffer from several legal defects. These include falsely asserting that the need for the so-called "temporary" redelegations, which have now been amended 29 times, is because of the "Presidential transition," which is long past, almost three years later. The Bernhardt Redelegation Orders also have falsely asserted they were necessitated by waiting for Senate confirmation when Mr. Trump has submitted

---

[4] Secretary of the Interior, Order No. 3345, Amendment No. 28, "Temporary Redelegation of Authority for Certain Vacant Non-Career Senate-Confirmed Positions," at: https://www.doi.gov/sites/doi.gov/files/elips/documents/s0_3345_a28_.pdf .

[5] Secretary of the Interior, Order No. 3345, Amendment No. 29, at: https://www.doi.gov/sites/doi.gov/files/uploads/order-number-3345-amendment-number-29-508.pdf .

no current nominee for the Director. That is, he flatly refuses to seek the Senate's advice and consent.[6]

### Appointment of Mr. Smith Contrary to the NPS Organic Act

49.     The appointment of Smith as "Deputy Director" by the Zinke and Bernhardt Redelegation Orders also violated the NPS Organic Act, 54 U.S.C. § 100302(b), which specifies only two Deputy Director positions, one for Operations and the other for Programs. The Organic Act is specific on the roles of the two NPS Deputy Directors and it does not provide for the non-existent Deputy position into which Smith was appointed. Further, the two statutorily-allowed Deputy Director positions were occupied by other officials at the time of Smith's initial appointment.[7]

### Additional Background Facts

50.     On Sept. 27, 2019, Plaintiff PEER sent letters to the Superintendents and other lead officials of the Park System units known to have allowed bicycle use pursuant to the past NPS special regulations. The PEER letters highlighted the legal defects and competing-use problems that would arise if those officials were to allow e-bikes on the designated backcountry trails in those units without public notice and NEPA compliance. PEER urged those officials not to allow e-bikes pursuant to the Smith Directive, but it has received no replies to its letters.

---

[6] Senate Energy and Natural Resources Committee website under "Nominations," for the lack of pending nominations for NPS Director:
https://www.energy.senate.gov/public/index.cfm/nominations .

[7] NPS News Release, Jan. 9, 2018, "Department of the Interior Names New National Park Service Deputy Director," at: https://www.nps.gov/orgs/1207/01-09-2019-deputy-director.htm .

51.     Under Defendant Vela's direction, the NPS as a whole, as well as dozens of individual Park units, have posted information for the public to further the implementation of the Smith Directive. The effect of Mr. Vela's implementation action has been to increase e-bike use System-wide and to exacerbate the legal violations and harmful impacts described herein.

## CLAIMS FOR RELIEF

### Count I – Violation of NPS Regulations and the Administrative Procedure Act

52.     Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs.

53.     NPS regulation 36 C.F.R. § 1.4 is unambiguous that a "bicycle" is a "device propelled solely by human power upon which a person or persons may ride on land, having one, two, or more wheels, except a manual wheelchair". The use of bicycles is regulated in detail under 36 C.F.R. § 4.30 (provided in full, *supra*) as well as by these Park-specific regulations adopted between 1987 and 2012: 36 C.F.R. §§ 7.11, 7.36, 7.90, and 7.97, allowing their use, as well as by the many additional post-2012 allowances by individual Park units that are not codified.

54.     The Smith Directive was arbitrary and capricious and an abuse of discretion because it ignored the mandate in the Secretary Bernhardt's Order in which he: "iv) Instruct[s] the Director, National Park Service (NPS) to develop a proposed rule to revise 36 CFR § 1.4 and any associated regulations to be consistent with this Order, add a definition for e-bikes consistent with 15 U.S.C. § 2085, and expressly exempt all e-bikes as defined in Sec. 4a from the definition of motor vehicles". (Secretary's Order, Sec. 5.a).

55.     Instead of developing "a proposed rule to revise 36 CFR § 1.4 and any associated regulations" as the Secretary instructed, Defendant Smith directed the NPS Superintendents to

immediately de-regulate e-bikes, to no longer regulate them as "motor vehicles," and instead to treat them as "bicycles". He directed the Superintendents to apply 36 C.F.R. § 4.30, stating he "requires that these provisions also govern the use of e-bikes so that the use of e-bikes and traditional bicycles are generally regulated in the same manner" (Smith Directive, at 3). He issued a new NPS "Policy" effective immediately: "E-bikes are allowed where traditional bicycles are allowed" (*Id.* at 2). This de-regulatory policy vastly increased the number of trails and routes in the Park System on which e-bikes are now allowed and are no longer prohibited as motor vehicles. It also violated § 4.30(d) by allowing extensive additional use of the bicycle trails without complying with the extensive planning, assessment, and compliance requirements in that subsection.

56.    No reasonable interpretation of the NPS regulations would allow Defendant Smith to direct the Superintendents to ignore that 36 CFR § 1.4 requires that "bicycles" be propelled "solely by human power," and e-bikes do not match that definition, and to further ignore that they do match the definition in § 1.4 of "motor vehicle".

57.    The arbitrary, capricious and discretion-abusing nature of Smith's interpretation is underscored by this statement in the Secretary's Order: "Uncertainty about the regulatory status of e-bikes has led the Federal land management agencies to impose restrictive access policies treating e-bikes as motor vehicles…." (Sec. 3, 4th paragraph), and further because the Secretary explicitly instructed Smith to promulgate a regulatory revision to "expressly exempt all e-bikes as defined in Sec. 4a from the definition of motor vehicles" (Sec. 5.a(iv)). After an admitted departmental history of interpreting e-bikes to be motor vehicles and an order by the Secretary that the NPS's regulatory definition of "motor vehicle" in 36 C.F.R. § 1.4 had to be changed first, it was starkly arbitrary and capricious for the Smith Directive to instead de-regulate them by fiat.

58.     Smith's action in effect amends the NPS regulations on bicycles and motor vehicles, but was promulgated under the false guise of a "policy" without the notice and comment procedures required by the APA for regulatory amendments. The effect of Smith's Directive has been to allow e-bikes on the numerous NPS trails that were prohibited to motor vehicles, but allowed for traditional bicycles. It is illegal under the APA to significantly broaden the scope and application of a Federal regulation as Defendant Smith's "policy" did without first going through rule-making to amend the regulation.

59.     Defendant Vela has continued to implement the illegal new e-bike "policy" in the Smith Directive since he took over leadership of the NPS.

60.     The actions and inactions by all of the Defendants for e-bikes described above are reviewable agency actions and agency rules that were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. Additionally, the Smith "policy" violated the existing NPS regulations on bicycles and motor vehicles and was ineffective to change those regulations.

61.     The effect of the Defendants' actions has been to harm Plaintiffs everywhere within the National Park System where e-bikes are newly allowed and no longer prohibited as motor vehicles.

## Count II – Violation of the National Environmental Policy Act

62.     Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs.

63.     NEPA requires, in pertinent part, that agencies "include in every …major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on— (i) the environmental impact of the proposed action, (ii) any adverse

environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C).

64.     The Defendants' e-bikes approvals were agency actions with the potential for significant environmental impacts that triggered NEPA's compliance requirements.

65.     The Defendants were required to conduct NEPA compliance by means of preparing an EIS or EA before approving e-bike use in the National Park System, but they failed to do so. Nor has the NPS properly claimed a categorical exclusion from NEPA. The Defendants therefore are in violation of NEPA.

66.     The effect of the Defendants' actions has been to harm Plaintiffs everywhere within the National Park System where e-bikes are newly allowed without prior NEPA compliance.

## Count III – Violation of the Federal Vacancies Reform Act and the Administrative Procedure Act

67.     Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs.

68.     Then-Secretary of the Interior Ryan Zinke's appointment of Mr. Smith as "acting Director" of the NPS in 2018 violated FVRA because Mr. Zinke lacked authority under FVRA to make that appointment and Mr. Smith did not otherwise qualify under FVRA to accede to that position. Only the President had the authority to name an acting Director.

69.     Defendant Bernhardt has further violated FVRA and the APA by purporting to redelegate the power to "exercise the authority of" the NPS Director to Mr. Smith and then to Mr.

Vela in 2019. The Bernhardt Redelegation Orders falsely asserted that the need for the "temporary" redelegations, which have now been amended 29 times during the Trump Administration, is because of the "Presidential transition," which is long past, nearly three years later. The Bernhardt Redelegation Orders also falsely asserted they were necessitated by waiting for Senate confirmation when Mr. Trump has submitted no current nominee to the Senate to be the NPS Director.

70.    The Zinke "acting Director" appointment for Smith in 2018 and the Bernhardt Redelegation Orders in 2019 appointing Smith and Vela into their Deputy Director positions "exercising the authority of" the NPS Director are reviewable "agency actions" under the APA because they are rules describing the organization of the NPS. Those appointments all were contrary to FVRA, arbitrary and capricious, an abuse of discretion, and otherwise contrary to law, in violation of the APA. Further, the Smith "Policy Memorandum" could only have been issued by a Senate-confirmed NPS Director or FVRA-compliant "acting" Director; he was neither.

71.    Because their appointments to their positions violated FVRA and the APA, the actions of Defendants Smith and Vela approving e-bikes were *ultra vires*. Because they were *ultra vires* actions taken in the absence of a Senate-confirmed NPS Director, Mr. Smith's and Mr. Vela's approvals of e-bikes have "no force or effect" under 5 USC §3348(d)(1). Further, their approvals cannot be ratified under §3348(d)(2).

72.    The effect of the Defendants' *ultra vires* actions has been to harm Plaintiffs everywhere within the National Park System where they allowed e-bikes.

## Count IV – Violation of the National Park Service Organic Act

73.    Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs.

74.     Mr. Smith approved his E-bikes Policy Memorandum using the title of "Deputy Director, Exercising the Authority of the Director of the National Park Service" acting under Secretary Bernhardt's Redelegation Order of Jan. 19, 2019. This title contravened the NPS Organic Act's allocation of leadership positions, 54 U.S.C. § 100302(b), which specifies only two Deputy Director positions and is explicit as to the roles of those Deputy Directors: one for "operations" and the other for "other programs". It does not provide for the Deputy position into which Smith was appointed, while the two allowed-for Deputy Director positions already had occupants at that time.

75.     Because he was appointed to a Deputy Director position that is not authorized under the NPS Organic Act, the actions of Defendant Smith approving e-bikes while he occupied that position are *ultra vires* and thus without force or effect.

76.     The effect of Defendant Smith's *ultra vires* actions has been to harm Plaintiffs everywhere within the National Park System where he allowed e-bikes.

## Count V – Violation of the Federal Advisory Committee Act

77.     Plaintiffs re-allege and incorporate by reference each and every allegation in the preceding paragraphs.

78.     The E-bike Partner & Agency Group meetings were "established or utilized by [the NPS and other interior bureaus], in the interest of obtaining advice or recommendation," therefore the Group fell squarely within the FACA definition of an "advisory committee". 5 U.S.C. App. § 3(2).

79.     The numerous advisory committee meetings regarding e-bike policies during 2018 and 2019 to date were neither open to other participants nor announced in the Federal Register as FACA requires.

80.     This advisory committee was not fairly representative of the range of private or public interests affected by e-bike use on NPS land. The participants included numerous private industry representatives who advised and advocated for e-bike de-regulation. In sum, the Group was a non-FACA compliant advisory committee.

81.     Defendants Department of the Interior and NPS hosted, and had numerous staff repeatedly participate in, this non-FACA compliant advisory committee. That participation directly led to the issuance of Defendant Bernhardt's Order and the Smith Directive de-regulating e-bikes at issue in this suit. Thus, those two agency actions were issued in violation of FACA.

82.     Defendants' hosting or participating in any further meetings of the E-bike Partner and Agency Group absent full compliance with FACA's requirements for advisory committees would violate the statute.

83.     The effects of the Defendants' FACA violations have been to deny Plaintiffs the opportunity to participate in the advisory committee, to harm them everywhere within the National Park System where the Defendants de-regulated e-bikes as a result, and to continue to harm Plaintiffs as long as the E-bike Partner and Agency Group meets without FACA compliance.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request the Court to order the following relief:

A. Declare that Defendants Smith and Vela violated the APA by approving e-bike use in a manner inconsistent with existing NPS regulations for bicycles and motor vehicles and that failed to conduct required rulemaking to amend those regulations; further that their de-regulatory actions were arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law;

B. Declare that Defendants Smith and Vela violated NEPA by failing to first prepare an EIS or EA on the effects of their actions approving e-bike use in the National Park System;

C. Declare that Defendant Bernhardt's Redelegation Orders by which Defendants Smith and Vela purported to "exercise the authority of the Director" of the NPS, which authority they used to promulgate their e-bike actions at issue, were contrary to FVRA's provision for "acting" officials and were arbitrary and capricious under the APA and otherwise not in accordance with the law;

D. Declare the actions approving e-bike use in the National Park System by Defendants Smith and Vela to be *ultra vires* and without force or effect under FVRA, 5 U.S.C. § 3348(b), because the NPS Director position was vacant at the time of their actions and they were not authorized under FVRA to take those actions;

E. Declare the actions approving e-bike use in National Park System by Mr. Smith to be *ultra vires* and without force or effect because he took those actions while occupying a Deputy Director position that contravened the NPS Organic Act;

F. Hold unlawful and set aside the actions of all the Defendants that have allowed e-bike use on non-motorized trails in the National Park System;

G. Issue a mandatory injunction ordering the NPS and its agents to close all non-motorized trails within the National Park System to e-bikes unless and until the violations of law set forth herein have been corrected to the satisfaction of this Court;

H. Issue a mandatory injunction ordering the NPS and its agents to remove all notices from all Park System websites that indicated approval of e-bike use on non-motorized trails within the

National Park System unless and until the violations of law set forth herein have been corrected to the satisfaction of this Court;

I. Enjoin any future actions by the Defendants to ratify the e-bikes approvals based on the FVRA violations and the prohibition in 5 U.S.C. § 3348(d)(2) that such actions may not be ratified;

J. Enjoin any further meetings by the Defendants or their staff with the E-bike Partner and Agency Group absent full compliance with FACA's requirements for advisory committees;

K. Award Plaintiffs their reasonable litigation expenses, including attorneys' fees, court costs, and other expenses pursuant to the Equal Access to Justice Act, 29 U.S.C. § 2412, *et seq.*; and

L. Grant such additional relief as the Court deems just and proper.

Dated: December 4, 2019

Respectfully submitted,

Peter T. Jenkins
D.C. Bar No. 477229
Paula Dinerstein
D.C. Bar No. 333971
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
202.265.4189 (tel.)
pjenkins@peer.org
pdinerstein@peer.org