**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PUBLIC EMPLOYEES FOR | : | | |
| ENVIRONMENTAL | : | | |
| RESPONSIBILITY, *et al.* | : | | |
| Plaintiffs, | : | Civil Action No.: | 19-3629 (RC) |
| | : | | |
| v. | : | Re Document No.: | 10, 11, 18, |
| | : | | 20, 21, 25 |
| | : | | |
| NATIONAL PARK SERVICE, | : | | |
| U.S. DEPARTMENT OF THE INTERIOR; | : | | |
| MARGARET EVERSON, in her official | : | | |
| capacity; and SCOTT DE LAVEGA, [1] | : | | |
| in his official capacity. | : | | |
| | : | | |
| Defendants. | : | | |

## <u>MEMORANDUM OPINION</u>

**Denying As Moot Defendants' Motion to Stay Pending Rulemaking; Denying As Moot Plaintiffs' Motion For Leave to File Surreply; Denying Motion to Modify Briefing Schedule; Denying Defendants' Motion to Dismiss, Granting Plaintiffs' Motion for Leave to File Supplemental Complaint; Denying Without Prejudice Plaintiffs' Motion to Complete or Supplement the Administrative Record**

## I. INTRODUCTION

Plaintiffs, a collection of non-profit environmental organizations and interested individuals, bring this action against the National Park Service, the United States Department of the Interior, the Director of the National Park Service, and the Secretary of the Interior, challenging the National Park Service's issuance of a policy memorandum concerning the use of electric-assisted bicycles in National Parks under the Administrative Procedure Act (the "APA"),

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Everson is automatically substituted for former Deputy Director Daniel P. Smith and former Deputy Director David Vela, while Scott de la Vega, current acting Secretary of the Interior, is similarly substituted for former Secretary of the Interior David Bernhardt.

5 U.S.C. §§ 701–06 (2012), and various other statutes.  Plaintiffs seek declaratory and injunctive relief.  While this case was pending, the National Park Service undertook a rulemaking and promulgated a Final Rule on the topic of electric bicycles, superseding the policy memorandum that was the focus of Plaintiffs' original complaint.  Plaintiffs request leave to file a supplemental complaint to incorporate new facts and allegations pertaining to the Final Rule.  In the meantime, Defendants have filed a motion to dismiss, contending that as a result of the promulgation of the Final Rule this action is now constitutionally and prudentially moot.  The Court grants Plaintiffs leave to supplement their complaint, as it finds this request to be in the interest of judicial economy, with a limited risk of undue delay or prejudice to Defendants.  Furthermore, because the Court retains the power to grant effective relief, it finds that Plaintiffs' claims are not moot and can proceed.

## II.  FACTUAL BACKGROUND

### A.  Regulation of Electric Bikes in the National Park System

Plaintiffs, who include Public Employees for Environmental Responsibility, Wilderness Watch, the Environmental Action Committee of West Marin, the Marin Conservation League, Save Our Seashore, Amy Meyer, Phyllis Koenig, and David Perel (collectively, "Plaintiffs") have brought this action against the National Park Service ("NPS"), the United States Department of the Interior, and in their official capacities acting Director of the National Park Margaret Everson and acting Secretary of the Interior Scott de la Vega (collectively, "Defendants"), challenging the NPS's policy regarding the use of electric-assisted bicycles ("e-bikes") in the National Park system.  Compl. ¶¶ 1, 9–18, ECF No. 1.

On August 29, 2019, the Secretary of the Interior signed Secretarial Order 3376 entitled "Increasing Recreational Opportunities through the Use of Electric Bikes" ("Secretarial Order")

to address the use of e-bikes on lands managed by the United States Department of the Interior. Compl. ¶ 32; *see also generally* Secretarial Order, ECF No. 10-2. The order purportedly sought to clarify any public uncertainty as to whether e-bikes "should be treated in the same manner as other types of bicycles or alternatively, [be] considered to be motor vehicles." Secretarial Order at AR-0915. To that end, the Secretarial Order defined what constituted an "e-bike" and set out a policy that vehicles that fall within the definition "shall be allowed where other types of bicycles are allowed" and "shall not be allowed where other types of bicycles are prohibited." Compl. ¶ 32; *see also* Secretarial Order at AR-916. Essentially, e-bikes were to be treated in the same manner as traditional, non-electric bicycles.

The Secretarial Order also directed the NPS to develop a proposed rule in accord with the order, that revised current NPS regulations to add a definition for e-bikes and to "expressly exempt all e-bikes as defined under the Order from the definition of motor vehicles." Compl. ¶ 32; *see also* Secretarial Order at AR-916.

The very next day, Deputy NPS Director Daniel P. Smith issued a policy memorandum ("the Smith Directive"), under the authority of the Director of the NPS addressing the use of e-bikes on NPS lands. Compl. ¶ 34; *see generally* Smith Directive, ECF No. 10-3. Deputy Director Smith issued the policy while "exercising the authority of the [NPS] Director." Smith Directive at 1. The Smith Directive's stated intent was to "allow e-bikes to be used for transportation and recreation in a similar manner to traditional bicycles." Smith Directive at 3; *see also* Compl. ¶ 34. To this end, the directive parroted language from the Secretarial Order, stating that "e-bikes are allowed where traditional bicycles are allowed" but "are not allowed where traditional bicycles are prohibited, including wilderness areas." Smith Directive at 2. Park superintendents were "directed to manage e-bikes consistent with this Memorandum." *Id.*

at 4.  The directive also required park superintendents to update their park compendium to include a definition of e-bike and the statement that "E-bikes are allowed in [insert name of park] where traditional bicycles are allowed," among other updates.  *Id.*  The directive noted that these updates "must" be taken "as soon as possible" and no later than 30 days after either the issuance of the Smith Directive or the introduction of e-bikes to the park, whichever was later.  *Id.*

Over a year later, on November 2, 2020, after undergoing notice and comment pursuant to the APA, the NPS published in the Federal Register its final e-bikes rule.  *See* Defs.' Mot. Dismiss Ex. 1 ("Final Rule"), ECF No. 24-1.  The Final Rule was signed by the Assistant Secretary of Fish, Wildlife and Parks for the Department of the Interior, Rob Wallace, who had been confirmed by the Senate to this position on June 27, 2019.[2]  *Id.* at 69,188.  The NPS published the proposed rule on April 8, 2020.  *See* General Provisions, Electric Bicycles, 85 Reg. 19, 711 (Apr. 8, 2020).  The Final Rule went into effect on December 2, 2020.  Final Rule at 69,177.

There are differences between the Smith Directive and Final Rule.  First, the Final Rule amended NPS Regulation 36 C.F.R. § 1.4 to add a new category of "electric bicycle" and exclude e-bikes from the definition of "motor vehicles."  Final Rule at 69, 177 and 69,188.  This differs from the Smith Directive, which simply changed its interpretation of NPS's existing

---

[2] U.S. Senate Committee for Environment and Public Works, Press Releases: *Senate Unanimously Confirms Wyoming's Rob Wallace to be Assistant Secretary for Fish, Wildlife and Parks* (June 27, 2019), available at https://www.epw.senate.gov/public/index.cfm/2019/6/senate-unanimously-confirms-wyoming-s-rob-wallace-to-be-assistant-secretary-for-fish-wildlife-and-parks.  The Court may take judicial notice of publicly available materials and information, such as the Federal Register and information available on government websites.  *See, e.g., Knapp Med. Ctr. v. Burwell*, 192 F. Supp. 3d 129, 131 n.1 (D.D.C. 2016) (allowing judicial notice to be taken of contents of government website); *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 112 (D.D.C. 2011) ("The contents of the Federal Register shall be judicially noticed.") (quoting 44 U.S.C. § 1507)).

regulations to conclude that e-bikes do not fall into the category of "motor vehicles."  The Final

Rule also uses more permissive language than the Smith Directive, providing that "electric bikes

*may* be allowed on roads, parking areas, administrative roads and trails that are open to

bicycles."  Final Rule at 69,188 (emphasis added).  In contrast, the Smith Directive indicated to

park superintendents that "[e]-bikes are allowed where traditional bicycles are allowed."  Smith

Directive at 2.

The text of the Final Rule explicitly states that, "once effective, [the Final Rule] will

supersede and replace [the Smith Directive]."  Final Rule at 69,177.  Despite this statement,

Plaintiffs argue that the Smith Directive continues to have ongoing policy consequences despite

the issuance of the Final Rule.  They point to text in the Final Rule's Preamble which notes that

as of the date of publication, "380 units of the National Park System have implemented the e-

bike policy [pursuant to the Smith Directive] . . . this means that for each of these NPS units e-

bikes are already allowed subject to the rules governing them that are set out in the compendium

and no further action would be needed to reauthorize[] the continued use of e-bikes under this

regulation."  *Id.* at 69,176.  Accordingly, these 380-park specific-approvals of e-bikes made

under the Smith Directive regime would appear to continue to this day, without needing to be re-

certified under the current Final Rule.

## B.  This Civil Action

Plaintiffs filed the original complaint in this action on December 5, 2019, seeking

declaratory and injunctive relief, *inter alia*, prohibiting Defendants from allowing e-bikes in the

National Park system without completing a rulemaking.  *See* Compl. ¶¶ A–L.  The complaint

included five claims brought pursuant to the APA and various other statutes.  *Id.* ¶¶ 52–83.

Plaintiffs' first claim alleges that the Smith Directive impermissibly amended long-existing NPS

regulations on bicycle use in National Parks by putting e-bikes under general bicycle regulations through the "false guise" of a policy change.  Compl. ¶¶ 52–61.[3]  They contend that this action violated the APA by circumventing the notice and comment procedures required by the APA for amending existing regulations, while also violating existing NPS regulations.  *Id.* ¶¶ 32–40, 52–61 (Claim I).  In their second claim, Plaintiffs assert that the Smith Directive violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(c), due to Defendants' alleged failure to prepare either an environmental assessment or an environmental impact statement to assess the environmental implications of the Smith Directive.  Compl. ¶¶ 40, 62–66 (Claim II).

Plaintiffs also find fault with the method by which the Smith Directive was promulgated.  They argue in their third claim that the Smith Directive was *ultra vires* because former Deputy NPS Director Smith, who issued the Smith Directive under the authority of an "acting Director" of the NPS, lacked proper authority to hold this position under the Federal Vacancies and Reform Act ("FVRA"), 5 U.S.C. §§ 3345–3349.  Compl. ¶¶ 68–71 (Claim III).  Similarly, in their fourth claim, Plaintiffs assert that because the NPS Organic Act, 54 U.S.C. § 100302, limits NPS to only two deputy directors at one time, and because three individuals, including Mr. Smith, held this role at the time the Smith Directive was issued, Mr. Smith's issuance of the directive must be found *ultra vires* and without force or effect.  Compl. ¶ 74–75 (Claim IV).

Finally, in their fifth and final claim, Plaintiffs allege that from 2017 through 2019, the NPS held at least eight industry-dominated policy advisory meetings of the E-bike Partner and Agency Group, meetings that they contend were illegal under the Federal Advisory Committee

---

[3] E-bikes were previously classified under the NPS definition of "motor vehicle." 36 C.F.R. § 1.4 ("Motor vehicle means every vehicle that is self-propelled and every vehicle that is propelled by electric power. . ..").  In contrast, bicycles were previously limited to "every device propelled solely by human power upon which a person or persons may ride on land, having one, two, or more wheels." *Id.*

Act ("FACA"), 5 U.S.C. § App'x 3, in that they were not properly open to the public and included numerous private industry representatives "who advised and advocated for e-bike de-regulation."  Compl. ¶¶ 41–44, 77–83 (Claim V).  The administrative record was filed and served by Defendants on June 1, 2020.  ECF No. 9-1.

On November 2, 2020, following the issuance of the Final Rule, Defendants filed their Motion to Dismiss Plaintiffs' Complaint as Moot ("Defs.' MTD"), ECF No. 21, pursuant to Federal Rule of Civil Procedure 12(b)(1).  Shortly thereafter, and while Defendants' motion to dismiss was still pending, Plaintiffs filed their own motion, seeking leave to file a supplemental complaint pursuant to Federal Rule of Civil Procedure 15(d) to incorporate allegations and facts regarding the Final Rule.  *See* Pls.' Motion for Leave to File Supplemental Complaint ("Pls.' Mot. Leave"), ECF No. 25.  The supplemental complaint brings the same five claims, but each has been updated to incorporate references to the Final Rule.  It is these two motions that are the primary subject of this Memorandum Opinion.

In addition, a number of procedural motions are also before the Court.  They include Plaintiffs' Motion to Stay Pending Rulemaking, ECF No. 10, Defendants' Motion for Leave to File Surreply, ECF No. 18, Plaintiffs' Motion to Modify Briefing Schedule, ECF No. 20, and Plaintiffs' Motion to Complete or Supplement Administrative Record, ECF No. 11.  The Court will quickly address the procedural motions before turning to the substantive matters at hand.

### III.  LEGAL STANDARDS

#### A.  Legal Standards for Supplementing a Complaint

Rule 15(d) of the Federal Rules of Civil Procedure authorizes a court, "on reasonable notice" and "on just terms," to permit a party to file a supplemental complaint setting forth any "occurrence, or event that happened after the date of the pleading to be supplemented."  Fed. R.

Civ. P. 15(d).  Supplemental complaints are thus used "to set forth new facts that update the original pleading or provide the basis for additional relief; to put forward new claims or defenses based on events that took place after the original complaint or answer was filed; [and] to include new parties where subsequent events have made it necessary to do so."  *United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002) (citing 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1504 (3d ed. 2010)).  By allowing this flexibility, Rule 15(d) operates "to make pleadings a means to achieve an orderly and fair administration of justice."  *Gomez v. Wilson,* 477 F.2d 411, 417 n.34 (D.C. Cir. 1973) (quoting *Griffin v. Cnty. Sch. Bd.*, 377 U.S. 218, 227 (1964)).

A court "has broad discretion in determining whether to allow supplemental pleadings." *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, No. 11-cv-1623, 2015 WL 13691541, at *2 (D.D.C. Feb. 3, 2015).  Supplemental pleadings are "to be freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action."  *Hall* v. *CIA*, 437 F.3d 94, 101 (D.C. Cir. 2006) (internal quotation marks omitted).  Supplementation is allowed even in situations where "the original pleading is defective in stating a claim," such as due to mootness. Fed. R. Civ. P. 15(d).  A court may, however, deny a motion to file a supplemental complaint as futile "if the proposed claim[s] would not survive a motion to dismiss." *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) (affirming denial of leave to file a supplemental complaint); *Oladokun v. Corr. Treatment Facility*, 5 F. Supp.3d 7, 13 (D.D.C. 2013) (explaining that when a party argues that a claim is futile because it would not survive a motion to dismiss, the claim is analyzed "under the same standard as would be applied to a motion to dismiss"

pursuant to Rule 12(b)(6).  Consequently, "in deciding whether to grant or deny a motion to supplement, the Court may consider the merits of the proposed new pleading." *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 12 (D.D.C. 2017) (citing *Burka v. Aetna Life Ins. Co*., 945 F. Supp. 313, 317 (D.D.C. 1996)).

### B.  Legal Standard for Motions to Dismiss for Mootness

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, courts must dismiss any claim over which they lack subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1); *see also Arbaugh v. Y&H Corp*., 546 U.S. 500, 506–07 (2006).  Such a motion can be raised "at any time" during the litigation.  Fed. R. Civ. P. 12(h)(3).[4]

The D.C. Circuit has explained that "[f]ederal courts lack [subject matter] jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."  *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)); *see also Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (noting that a court has "no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.") (citations omitted).  A case becomes constitutionally moot when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome," *Conservation Force, Inc. v. Jewell,* 733 F.3d 1200, 1204 (D.C. Cir. 2013), or when "intervening events make it impossible to grant the prevailing party effective relief."  *Lemon v.*

---

[4] In evaluating a motion to dismiss for lack of subject matter jurisdiction, the Court is not limited (as is typical) to the allegations contained in the complaint.  *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n. 10 (D.C. Cir. 1987).  This is because the motion focuses on the Court's very power to hear a claim.  *Id.*  Instead, "where necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis*., 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

*Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (quoting *Burlington N. R.R. Co. v. Surface Transp. Bd.*, 75 F.3d 685, 688 (D.C. Cir. 1996)).  "Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n,* 680 F.2d 810, 814 (D.C. Cir. 1982); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) (finding as moot superseded agency Record of Decision that had "no current force or effect").

"The initial 'heavy burden' of establishing mootness lies with the party asserting a case is moot."  *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (citing *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998)).  However, it is the opposing party who bears the burden of showing an exception to the mootness doctrine applies.  *Id.*; *see also Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 14 (D.C. Cir. 2019).

## IV.  ANALYSIS

### A.  Preliminary Procedural Motions

#### 1.  Defendants' Motion to Stay Pending Rulemaking is Dismissed as Moot

On June 11, 2020, Defendants moved to stay this litigation until October 15, 2020, pending the issuance of the final regulation regarding e-bikes.  *See* Defs.' Mot. for Temp. Partial Stay of Litig. Pending Completion of Rulemaking ("Defs.' Mot. for Stay"), ECF No. 10. Defendants argued at the time that the stay would allow the Court "to avoid unnecessary litigation" because upon the issuance of a final rule, they contended that Plaintiffs' claims would become "constitutionally moot."  Defs.' Mot. for Stay at 1.  For this reason, Defendants requested a stay that would "automatically expire on October 15, 2020 . . . when Defendants file a notice that the final rule has been published."  *Id.*  But the Final Rule has now been published

and this date elapsed, and indeed, Defendants now directly challenge the subject matter jurisdiction of Plaintiffs' claims on the aforementioned grounds.  *See generally* Defs.' MTD. Because the Defendants' entire rationale for this motion has been eclipsed by the progression of events in this case, the Court will deny Defendants' Motion for Stay as moot.[5]

### 2.  Plaintiffs' Motion to Modify Briefing Schedule is Denied

Turning to the next procedural motion, on October 19, 2020, Plaintiffs filed a motion requesting that the Court accelerate briefing on the merits by allowing summary judgment briefing to commence within 30 days of an entry of any Court Order.  See Pls.' Mot. Mod. Sched. at 7, ECF No. 20.  The motion sought to alter the current schedule governing this case which states that Plaintiffs are to file their Motion for Summary Judgment within 30 days after any intervening motions are decided by the Court.  *See* March 31, 2020 Minute Order.  Because this opinion resolves the intervening motions in this case, Plaintiffs' prior request is obsolete. Consequently, the Court denies Plaintiffs' motion to modify the briefing schedule.

### B.  Plaintiffs' Motion for Leave to File Supplemental Complaint and Defendants' Motion to Dismiss for Mootness

In light of the issuance of the Final Rule, Defendants filed a motion to dismiss the original complaint as moot on November 2, 2020.  *See* Defs.' MTD.  Within the same week, Plaintiffs sought leave to file a supplemental complaint, which, while preserving many of Plaintiffs' original claims, also incorporates allegations pertaining to the Final Rule.  *See* Pls.' Mot. Leave.  Defendants oppose this motion, citing both judicial efficiency concerns while also arguing that the proposed supplementation should be denied on futility grounds, for largely the

---

[5] Plaintiffs' Motion for Leave to File Surreply on this issue, ECF. No. 18, is also denied as moot, given the mootness of the entire issue of the stay in question.

same mootness issues they raise in their motion to dismiss.  *See* Defs.' Opp'n to Pls.' Mot. for

Leave to File Supp. Compl. ("Defs.' Leave Opp'n"), ECF No. 28.  Despite Defendants'

arguments to the contrary, the Court finds that the grant of leave is appropriate here as it will

"promote the economic and speedy disposition of the entire controversy" and no undue delay or

prejudice to Defendants will result.  *Hall*, 437 F.3d at 101.  Furthermore, because the Court is

permitted to consider the merits of the proposed supplemental complaint, and given that

Defendants' motion to dismiss focuses on many of the same issues with overlapping arguments,

Defendants' concerns regarding the potential futility of the supplemented claims can be

addressed and resolved here with minimal confusion.  The Court will proceed by first addressing

Defendants' judicial efficiency concerns, before conducting a review of Plaintiffs' proposed

supplemental complaint against the futility standard.  In doing so, it will incorporate and evaluate

the arguments raised in Defendants' motion to dismiss, as the Rule 15(d) futility standard and

Rule 12 dismissal standard is one and the same.[6]

1.  Granting Plaintiffs Leave to File their Supplemental Complaint is in the Interest of Judicial Efficiency

Looking first at the judicial efficiency concerns surrounding the motion for leave,

Plaintiffs posit—and the Court agrees— that allowing them leave to supplement their complaint

will promote the speedy disposition of the entire controversy.  Plaintiffs' proposed supplemental

complaint focuses on the same core issue from the original complaint—agency action pertaining

to e-bike use in National Parks.  Plaintiffs make the reasonable point that because the Smith

---

[6] The futility standard under Rule 15(d) asks if the proposed supplemental claims would
survive a motion to dismiss under Rule 12.  *See Oladokun*, 5 F. Supp.3d at 13.  Accordingly, in
conducting this analysis the Court will address the arguments raised by Defendants in their
motion to dismiss briefing regarding the mootness issue.

Directive and Final Rule are "tightly intertwined," familiarity with the Smith Directive is necessary to fully understand and evaluate any supplemented claims based on the Final Rule. Pls.' Reply in Support of Mot. for Leave ("Pls.' Leave Reply") at 18, ECF No. 30.  This argument finds support in the text of the Final Rule, which explicitly states that it "codifies the decision made in the [Smith Directive]."  Final Rule at. 69,186.  And compared to the alternative, supplementing the complaint is a far more reasonable course of action.  In lieu of supplementation, Plaintiffs would have to file an entirely new case, a largely redundant and costly move.  Unlike supplementation, having to file a new related case (that pursuant to the D.C. District Court Local Rules, would likely make its way back before this Court) would cause unnecessary delay and filing fees to be borne by Plaintiffs (who are largely non-profit organizations).  Consequently, allowing leave to file a supplemental complaint will best conserve the resources of both the Court and counsel, and allow the Court to address the matters at issue efficiently.

Defendants still contend that judicial economy would be better served by "requiring Plaintiffs to file any challenge to the [Final Rule] in a new case," Defs.' Leave Opp'n at 10, relying on the argument that Plaintiffs' proposed supplemental complaint, by entangling moot claims with new claims, needlessly complicates the case.  *Id.*  But this concern is addressed in this very briefing.  Moot claims are necessarily futile.  *See Larsen*, 525 F.3d 1, 4 (D.C. Cir. 2008) (noting courts lack subject matter jurisdiction over moot claims); *see also Ulibarri v. Southland Royalty Co., LLC,* No. 16-cv-215, 2019 WL 78781, at *3 (D.N.M. Jan. 2, 2019) (explaining that because "[c]ourts do not have subject matter jurisdiction over moot claims," proposed amendments that were moot were "futile.").  Consequently, the Court will review the supplemental complaint under the governing futility standard, while concurrently considering the

arguments raised in Defendants' motion to dismiss, and prohibit supplementation of any claims

that have been rendered moot by the passage of the Final Rule. This will prevent the "needless

complication" Defendants fear. Moreover, Plaintiffs' supplemental complaint will allow the

Court to focus on the complete set of issues in this controversy that are live and ready for

adjudication, allowing for a comprehensive—not piecemeal— resolution.

Supplementation of the complaint will also not cause undue delay or trial inconvenience,

given the relatively early stage of this litigation. Nor do the Defendants provide any reason that

they will be unduly prejudiced by this decision. As a result, the Court finds there is no reason for

it to not "freely grant" Plaintiffs leave to file their supplemental complaint for all claims that

survive the Court's futility analysis.

### C. Futility Analysis of Plaintiffs' Proposed Supplemental Complaint

The Court will now evaluate Plaintiffs' proposed supplemental complaint to determine if

it can pass the futility analysis. Defendants raise several overarching issues in arguing for

futility. First, they contend that the Smith Directive was not a final agency action, and thus any

suit challenging it lacks the required cause of action to proceed under the APA. Second, they

claim Plaintiffs' proposed supplemental complaint brings programmatic attacks on the NPS's

general e-bike program, a type of challenge that is similarly verboten under the APA. Third and

last, Defendants argue that all of Plaintiffs' claims against the Smith Directive have been mooted

in their entirety by the issuance of the Final Rule. The Court examines each claim in turn below.

### 1. The Smith Directive Was a Final Agency Action

Defendants begin their attack on Plaintiffs' proposed supplemental complaint by

contending that the Smith Directive does not constitute a final agency action, and thus cannot be

challenged under the APA. Defs.' Leave Opp'n at 6. Because of this deficiency, they argue that

all five counts of Plaintiffs' proposed supplemental complaint fail to state a claim to the extent they challenge the Smith Directive. *Id.* This argument has no merit.

Under the APA, judicial review is only available to "final agency action." 5 U.S.C. § 704. If this threshold is not met, the case cannot proceed, as Plaintiffs would lack a cause of action. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006) (noting Section 704 operates to "limit[] causes of action under the APA."). The APA defines "agency action" as including "the whole or part of an agency rule." 5 U.S.C. § 551(13). An agency "rule," in turn, is defined as including "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id*. § 551(4) (emphasis added). The Smith Directive meets these criteria. It was a statement issued by the top NPS officer, interpreting the current NPS regulations and setting e-bike policy, that required NPS park superintendents to take concrete steps to allow e-bikes within NPS parks. *See generally* Smith Directive. The fact that it was not promulgated through notice and comment rulemaking has no bearing on this analysis. *See Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs*, 417 F.3d 1272, 1285 (D.C. Cir. 2005) ("[W]e have not hesitated to consider an agency pronouncement issued without meeting required APA procedures a rule."); *see also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("That the issuance of a guideline or guidance may constitute final agency action has been settled in this circuit for many years."). Indeed, in the Final Rule, the NPS even referred to the Smith Directive as the "established [e-bike] management regime." Final Rule at 69,186. Consequently, since the Smith Directive can properly be considered an "agency action," the question becomes whether it is also sufficiently final for the purposes of section 704.

The Supreme Court has articulated a two-part test for determining whether an agency action is final.  *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "First, the action must mark the 'consummation' of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature."  *Id*. (citation omitted).  Second, "the action must be one by which rights or obligations have been determined or from which legal consequences will flow." *Id*. at 178 (internal quotation marks and citation omitted).  Courts are further directed to "apply the finality requirement in a 'flexible' and 'pragmatic' way."  *Ciba–Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50, 87 (1967)).

Defendants argue that neither requirement is met here.  They claim that the Smith Directive was not the "consummation of the agency's decision-making process" because the directive itself did not specifically "designate any road or trail as open to e-bikes," instead leaving those decisions "to be made at the park level."  Defs.' Leave Opp'n at 6–7.  They also imply that the second requirement of the *Bennett* test, that the action in question be the type "by which rights or obligations have been determined, or from which legal consequences will flow," fails for the same reason.  *Id.*  The Court disagrees as to both prongs of the test.

As the D.C. Circuit has dictated, "[t]he consummation prong of the finality inquiry requires us to determine 'whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue,' or is, instead, 'only the ruling of a subordinate official, or tentative.'" *NRDC v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020) (quoting *Soundboard Ass'n v. Fed. Trade Comm'n,* 888 F.3d 1261, 1267 (D.C. Cir. 2018)).  The Smith Directive speaks for the NPS, articulating the agency's overall policy and approach with respect to e-bikes.  It uses mandatory—not tentative—language, stating that that

"[e]-bikes are allowed where traditional bicycles are allowed," and lists as a "required action" that "[s]uperintendents are directed to manage bikes consistent with this [Directive]."  Smith Directive at 2, 4.  Moreover, the policy document was issued by Deputy Director Smith, "exercising the authority of the [NPS] Director," Smith Directive at 1, meaning this action emanated from one of the highest-ranking officials at the NPS.  Taken together, these factors indicate the first prong of the finality inquiry is met.  *See POET Biorefining, LLC v. Environmental Protection Agency*, 970 F.3d 392, 404 (D.C. Cir. 2020) (holding that guidance constituted consummated agency action where it "consistently speaks in [agency's] voice, setting forth the 'interpretation' and 'guidance' of the agency" and had been issued by a high-ranking official).

Defendants' argument to the contrary is belied by the text of the directive.  The Smith Directive clearly announces that the NPS policy on e-bikes is that "[e]-bikes are allowed where traditional bicycles are allowed" and directs park superintendents "to manage e-bikes consistent with this Memorandum."  Smith Directive at 2.  It further "required" that park superintendents "must take the following actions as soon as possible" including updating their park compendiums to read that "E-bikes are allowed in [insert name of park] where traditional bicycles are allowed."  *Id*. at 4.  Consequently, for the thirteen park units that already allowed traditional bicycle-use prior to the promulgation of the Smith Directive, they had no option but to implement this policy.  *See* Supp. Compl. ¶¶ 36–37.  So while Defendants are correct in that individual park superintendents retained the ability to thereafter impose "limit[s] or restrict[ions] or impose conditions on bicycle use, including specific limitations on e-bike use," after going through a number of procedural steps, Smith Directive at 3, they were still required to first impose the overarching NPS policy of equal treatment between e-bikes and traditional bicycles.

In sum, the language of the directive makes clear that the settled NPS rule going forward was that "e-bikes are allowed where traditional bicycles are allowed . . . [t]he intent of this policy is to allow e-bikes to be used for transportation and recreation in a similar manner to traditional bicycles." *Id.* at 1–2.  The Smith Directive thus constituted the consummation of the NPS's decision-making process on the topic of e-bikes.[7]

Proceeding to the second question under the *Bennett* test, the Court must determine whether the Smith Directive has direct and appreciable legal consequences.  This inquiry requires the Court to "pragmatic[ally]" focus on "the concrete consequences [the] action has or does not have . . ." *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 617, 637 (D.C. Cir. 2019) (internal quotation marks omitted).

The Smith Directive, in effect, served to backhandedly amend the long-standing NPS regulations on bicycle use in NPS parks by moving e-bikes—which until this point fell under the NPS regulations regulating motor vehicles—under the same regulations as those that governed traditional bicycles.  As the Smith Directive mandated, "[a] person operating an e-bike is subject to the following sections of 36 CFR part 4 that apply to the use of traditional bicycles."  Smith Directive at 3.  Consequently, the Smith Directive created direct and appreciable legal consequences for NPS park patrons—they now had the new right to operate an e-bike where

---

[7] To the extent Defendants somewhat obliquely argue that the Smith Directive was not a final agency action because it was later replaced by the Final Rule, *see* Defs.' Leave Opp'n at 7, this ignores that an "interim agency resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency. In that event, the interim resolution is the final word from the agency on what will happen up to the time of any different permanent decision." *Wheeler*, 955 F.3d at 78; *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (noting "the fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.").  Because the Smith Directive constituted the "final word" from the NPS on the topic of e-bikes until the Final Rule was promulgated, Defendants' argument has no bearing on the finality analysis.

traditional bicycles were allowed.  *See* Smith Directive at 2 ("E-bikes are allowed where traditional bicycles are allowed").

Again, the limited discretion reserved to park superintendents to make trail specific designations does not negate that the policy had concrete legal consequences.  In *Appalachian Power Co.*, the D.C. Circuit found that an EPA guidance document created legal consequences necessary for finality because the policy document created "obligations on the part of State regulators and those they regulate."  208 F.3d at 1023 (noting the document "commands, it requires, it orders, it dictates," giving states "their 'marching orders'" that the EPA expected them to follow, and that almost all of them did).  The Smith Directive operated in much the same way, creating obligations on the part of the park superintendents, "direct[ing]" them to "manage e-bikes consistent with this memorandum," "requir[ing]" edits to their park compendium to allow e-bikes where traditional bicycles were allowed, and that e-bikes and traditional bicycles be subject to the same regulations.  Smith Directive at 2,4.  The "marching orders" the directive gave to park superintendents was clear—going forward, in NPS parks, "e-bikes *are* allowed where traditional bicycles are allowed."  *Id.* (emphasis added).  This conclusion is reinforced by the fact that over 380 NPS park units "fell in line" and adopted these measures by the time the Final Rule was promulgated.  Based on these facts, the Court finds that the Smith Directive was a final agency action, as it reflected the settled NPS position on e-bikes and created legal consequences and obligations for park superintendents managing individual NPS Parks and for park patrons who gained the right to use e-bikes in NPS parks.

### 2.  The Supplemental Complaint Does Not Bring Programmatic Attacks

Defendants next try to block the filing of Plaintiffs' proposed supplemental complaint on the grounds that they claim it brings non-justiciable, programmatic attacks on the NPS's e-bike

policies in general.  Contrary to Defendants' contentions, the Court finds that Plaintiffs challenge only discrete agency actions subject to review under the APA.

The APA permits judicial review only when "[a] person suffer[s] legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702.  "Agency action," in turn, "includes . . . an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13); s*ee also id*. § 701(b)(2).  Each type of agency action is "circumscribed" and "discrete."  *Norton v. S. Utah Wilderness All*., 542 U.S. 55, 62 (2004).  As a result, the APA proscribes "'broad programmatic attack[s]' on an agency's compliance with a statutory scheme."  *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.,* No. 18-cv-2473, 2020 WL 7024193 (D.D.C. Nov. 30, 2020) (quoting *Norton*, 542 U.S. at 64).  This means that an "entire [agency] program cannot be laid before the courts for wholesale correction under the APA." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (rejecting wholesale challenge to Bureau of Land Management's land withdrawal review program as impermissibly programmatic, holding that plaintiff must instead "direct its attack against some particular 'agency action' that cause[d] it harm.").  Nor can a plaintiff bring "generalized complaints about agency behavior," because "an on-going program or policy is not, in itself, a 'final agency action' under the APA."  *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 240 F.3d at 1095).  However, the Court finds that none of these flaws infect Plaintiffs' proposed supplemental complaint.

Defendants, while acknowledging that the Smith Directive and Final Rule are discrete acts, contend that Plaintiffs' references to "unspecified approvals" of e-bike use taken by park superintendents constitute a forbidden programmatic attack on "NPS's management of e-bikes in

its totality." Defs.' Leave Opp'n at 7–8. But this is simply not an accurate reflection of the content of the proposed supplemental complaint, which does not lodge any sort of generalized programmatic attack. Plaintiffs' supplemental complaint is squarely focused on the Smith Directive and Final Rule, and seeks only relief stemming directly from these two agency actions.[8]

A review of *Lujan* is instructive. There, the Supreme Court held that plaintiffs brought a programmatic attack because they challenged not "a single . . . order or regulation" but rather an entire program the agency colloquially referred to as its "land withdrawal review program," that was comprised of "1250 or so individual classification terminations and withdrawal revocations." *Lujan*, 497 U.S. at 890 (citation omitted). By contrast, here Plaintiffs challenge only the NPS's Smith Directive and Final Rule. It is true that Plaintiffs seek relief in the form of this Court "[s]et[ting] aside the actions of all the Defendants that have allowed e-bike use on non-motorized trails in the National Park System." Supp Compl. ¶ F. But these are actions that were taken directly pursuant to the challenged Smith Directive and Final Rule. And as the Supreme Court explained in *Lujan*, an agency action is reviewable "to the extent that, specific

---

[8] A review of the specifics of the "unspecified approvals" that Defendants claim constitute impermissible programmatic attacks in the proposed supplemental complaint further reinforces that this argument is without merit. The first reference is to a portion of the proposed supplemental complaint that merely lists the NPS park units with designated bike trails in backcountry areas, along with Plaintiffs' allegation that, "[t]he Smith Directive . . . opened all of them effective on August 30, 2019, to e-bike use by his fiat." Supp. Compl. ¶ 37. This is not an attack on an entire program but rather an illustration of a specific effect caused by the Smith Directive that Plaintiffs challenge. The other "unspecified approval" Defendants identify is nothing more than a citation to Plaintiffs' NEPA claim, which asserts that "Defendants' e-bikes approvals, including the initial Smith Directive, the more than 380 individual Park Unit approvals to date, and the Final Rule, were connected agency actions with the potential for environmental impacts that triggered NEPA's compliance requirements." Supp Compl. ¶ 56. Again, the Court struggles to see how this is a programmatic attack, as opposed to a specific pleading targeting the Smith Directive and Final Rule and the direct policy consequences of these final agency actions.

'final agency action' has an actual or immediately threatened effect." *Lujan*, 497 U.S. at 894. Here, the actual effect of the Smith Directive and Final Rule has been to open up NPS parks to e-bikes. Thus, Plaintiffs do not mount a programmatic attack, but rather seek to also rein in the direct effects of the two final agency actions they challenge. *See, e.g.*, *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50–51 (D.D.C. 2014) (permitting challenge to five specific purported applications of a challenged policy). Therefore, the Court rejects Defendants' argument for futility on these grounds.

### 3. Plaintiffs' Proposed Supplemental Complaint is Not Moot

The Court now turns to its inquiry into whether any of the claims brought by Plaintiffs are moot, and thus futile. Defendants argue in their motion to dismiss that the issuance of the Final Rule, by explicitly superseding and replacing the Smith Directive, has mooted the entirety of Plaintiffs' original complaint. Defs.' MTD at 1. If true, then any claims against the Smith Directive preserved in Plaintiffs' proposed supplemental complaint cannot proceed.[9] Plaintiffs contest this assertion, claiming that the Final Rule did not fully supersede the Smith Directive "because its harmful effects remain intact" and because the scope of the Smith Directive was less permissive than the Final Rule. Pls.' MTD Opp'n at 10, 12. The Court concludes that because it remains able to award real-world relief to Plaintiffs, these claims are not moot. Accordingly, it will allow Plaintiffs leave to file their proposed supplemental complaint.

The Court does not contest that courts regularly find that actions challenging superseded, expired, or withdrawn agency polices or decision documents are moot because they no longer

---

[9] As Defendants accurately note, Plaintiffs' proposed supplemental complaint still retains nearly all of the allegations targeting the Smith Directive from their original complaint, Defs.' Leave Opp'n at 5 n.3, with the only exception being Count I which pares down Plaintiffs' original allegations slightly.

present a live controversy.  *See, e.g.*, *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 79

(finding that a superseded agency policy document "no longer exists" and any action brought to

challenge it is moot); *Blue Water Balt. v. Pruitt*, 266 F. Supp. 3d 174, 180–81 (D.D.C. 2017)

(determining that where a newly issued EPA report superseded the previous iteration of the

report, it "thus moot[ed] the plaintiffs' challenge to the reclassifications in the [original report]");

*Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) (finding claim

against expired policy memorandum moot); *see also Worth v. Jackson*, 451 F.3d 854, 861 (D.C.

Cir. 2006) ("[T]he Constitution nowhere licenses us to rule on the legality of an agency policy

that no longer exists.").

This conclusion rests on the principal that where there is no longer any live controversy

between the parties, there remains no role for the courts.  "If it becomes impossible for the court

to grant any effectual relief *whatever* to a prevailing party on a particular claim, that claim must

be dismissed." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 79 (emphasis added and

internal quotations omitted); *see also Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601

F.3d 1096, 1111–12 (10th Cir. 2010) (finding that where a challenged agency opinion had been

superseded, plaintiff's requested injunctive and declaratory relief would be "meaningless" and

"have no effect in the real world," rendering action moot).  For in this type of situation even if a

court were to issue an opinion, it would be nothing more than a meaningless advisory policy.

*See Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (noting that courts have "no

authority to give opinions upon moot questions or abstract propositions, or to declare principles

or rules of law which cannot affect the matter in issue in the case before it.").  And "the oldest

and most consistent thread in the federal law of justiciability is that the federal courts will not

give advisory opinions." *Pub. Serv. Elec. & Gas Co. v. FERC*, 783 F.3d 1270, 1274 (D.C. Cir.

2015). The crucial question for a mootness inquiry, therefore, often becomes whether a court remains able to grant any effectual relief.

Defendants argue that this case warrants a straightforward application of these mootness principals. They contend that, because the text of the Final Rule explicitly states that it "supersedes and replaces the Smith Directive," and because the majority of Plaintiffs' claims challenge the now superseded Smith Directive, as a result "there is no effective relief available" for Plaintiffs' claims, Defs.' MTD at 11–12, as any live controversy between the parties has since been extinguished. The plain language of the Final Rule does indeed, unequivocally state that it "supersedes" the Smith Directive. *See* Final Rule at 69,177; *see also United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) ("Where the language is clear, that is the end of judicial inquiry 'in all but the most extraordinary circumstances.'") (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 474 (1992)).

However, this conclusion runs into trouble when the Court turns its focus to the question of whether it remains able to grant any of the relief requested by Plaintiffs. For a case is only moot if a court is unable to grant "any effectual relief *whatever* to the prevailing party." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal citations and quotation marks omitted; emphasis added); *Calderon v. Moore*, 518 U.S. 149, 150 (1996) ("[E]ven the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'") (citing *Mills v. Green*, 159 U.S. 651, 653 (1895)). This bar is not high. To demonstrate a live controversy, Plaintiffs "need only show that some form of effective relief could be available to them should they prevail— however partial the remedy, however uncertain its potential to truly address Plaintiffs' concerns." *Ctr. for Food Safety v. Salazar*, 900 F. Supp. 2d 1, 7 (D.D.C. 2012). Plaintiffs manage to clear this low bar here.

In their proposed supplemental complaint, Plaintiffs ask this Court to "[d]eclare that Defendants' actions in the form of the [Smith Directive]' were arbitrary and capricious, an abuse of discretion, and otherwise not in accord with the law," Supp. Compl. ¶ A, and to "[s]et aside the actions of all the Defendants that have allowed e-bike use on non-motorized trails in the National Park System."  Supp Compl. ¶ F.  This refers to what Plaintiffs term the "improper e-bikes approvals" in park units that occurred in the interim period after the issuance of the Smith Directive, but before the Final Rule took effect.  Pls. MTD Opp'n at 10–11.  The Final Rule acknowledged that as of the date of publication, 380 NPS units had already implemented the e-bike policy pursuant to the Smith Directive's mandate.  Final Rule at 69,176.  The Final Rule contains no reference indicating that it should be applied in a retroactive manner, meaning that the 380 NPS park e-bike designations that occurred prior to the promulgation of the Final Rule would appear to still be governed by the Smith Directive's regime.  Accordingly, if the Court were to find the Smith Directive unlawful, it could award real-world relief by invalidating the park actions taken pursuant to this authority.  *See* 5 U.S.C. § 706(2)(A) (empowering courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  Because the Court retains the ability to award effectual relief, with real-world consequences, Plaintiffs' claims against the Smith Directive are not moot.

This conclusion is in accord with the findings of other courts that have confronted similar issues.  For example, in *Rocky Mountain Farmers Union v. Corey*, an amendment to a fuel standards regulation did not moot an ongoing challenge to the previous regulation, because credits awarded under the old standard continued forward even under the new regime, 730 F.3d 1070, 1097 n.12 (9th Cir. 2013), just as the e-bike designations made pursuant to Smith Directive

continue under the Final Rule here.  *See* Final Rule at 69,176 (noting that "for each of these NPS units [where] e-bikes are already allowed [under the Smith Directive] no further action would be needed to reauthorize[] the continued use of e-bikes under this regulation.").  The "propriety of the scheme under which credits were distributed remain[ed] a live controversy" in *Corey*, 730 F.3d at 1097 n.12, in much the same way as the legitimacy of the Smith Directive remains a live issue here because it controls whether the 380 NPS park e-bike designations made pursuant to the directive were lawful.  Similarly, in *First National Bank of Lamarque v. Smith,* the Comptroller of the Currency superseded an informal letter directive with a formal regulation that had undergone notice and comment.  *See* 610 F.2d 1258, 1262–1263 (5th Cir. 1980).  However, the court found that because the new regulation was not retroactive, transactions that occurred prior to the effective date of the formal regulation continued to be controlled by the letter directive, meaning an ongoing challenge to the letter directive was not moot.  *Id; see also* Wright & Miller, 13C Fed. Prac. & Proc. Jurs. § 3533.6 (3d ed. 2020) (noting mootness does not occur even when an agency action has been superseded "when the former provisions continue to control the consequences of past transactions.").

Defendants do not challenge this general proposition.  Instead, they contend that the Court does not have the authority to invalidate any of the individual park decisions to allow e-bikes made pursuant to the Smith Directive.  They assert that a "plain reading" of the Smith Directive shows that it does not actually "authorize the use of e-bikes in any park."  Defs.' Mot. to Dismiss Reply ("Defs.' MTD Reply") at 3, ECF 30.  This somewhat extraordinary claim seems to hinge on their contention that "[w]hile the [Smith Directive] provides policy direction," it "expressly acknowledged that superintendents retain the authority to limit or restrict or impose conditions on bicycle use, including specific limitations on e-bike use . . ."  *Id.* at 3.  In sum,

Defendants' argument seems to be that because park superintendents retained limited discretion over where in the parks e-bike were allowed, the individual park decisions cannot be said to have been made under the Smith Directive at all. As a result, they claim that if Plaintiffs want to reverse any of the park-specific determinations made to allow e-bikes under the Smith Directive, they must challenge each of the 380 park designations individually. *See* Pls.' MTD Opp'n at 10.

This is outcome is nonsensical, not to mention the Court's "plain reading" of the Smith Directive comes to a very different conclusion. The language of the Smith Directive is mandatory: under the subheading "Required Actions" park superintendents "are directed to manage e-bikes consistent with this Memorandum under the authority in 36 CFR 1.5(a)(2)." Smith Directive at 4. The directive's e-bike policy, with which consistency was required, was that "e-bikes are allowed where traditional bicycles are allowed." *Id*. at 2. The directive's required actions for park superintendents continue, noting that, "as soon as possible" and no later than 30 days after either the issuance of the Smith Directive or the introduction of e-bikes to their park, superintendents "must" update their park compendium to read that "E-bikes are allowed in [inset name of park] where traditional bicycles are allowed." *Id*. at 4. Based on this text, the Court struggles to see how Defendants can claim that the Smith Directive did not "authorize the use of e-bikes in any park." Defs.' MTD Reply at 3. The language of the Smith Directive does not just authorize e-bike use, it makes it compulsory for those NPS parks, of which Plaintiffs allege there were thirteen, that already allowed other types of bicycles. *See* Supp. Compl. ¶ 36–37. Defendants even acknowledged the compulsory nature of the Smith Directive, contrasting it with the more permissive language employed regarding e-bike use in the Final Rule. *See* Defs.' MTD Reply at 4 ("the Rule states that e-bikes 'may be allowed,' while the Policy said they 'are allowed.'"). The mandatory nature of the Smith Directive is reinforced by the fact that 380 units,

or about 90% of the overall NPS system followed the directive—a statistic that does not demonstrate that individual park superintendents believed they had the discretion to decline to follow the new e-bike policy.

And while the Final Rule states that "no further action would be needed to reauthorize continued use of e-bikes" for parks that had already adopted e-bike use, Final Rule at 69,176, it does not state that the rule applies retroactively such that it encompasses these decisions. Consequently, even if Plaintiffs followed Defendants' suggestion and sought to invalidate each e-bike designation on a park-by-park basis, the administrative record would, the Court imagines, consist primarily of the Smith Directive.  This further reinforces the Court's conclusion that the park e-bike approvals constitute agency action taken pursuant to the Smith Directive.[10]

For all of these reasons, the Court finds that the 380 individual NPS park unit decisions to allow e-bikes were taken pursuant to the Smith Directive, and do not constitute separate actions. And because the APA grants to federal courts such as this one the authority to "set aside agency action" inconsistent with the APA requirements, *see* 5 U.S.C. 706, this Court retains the power to invalidate these park-specific designations if the Smith Directive is found void.  As a result, Plaintiffs' claims against the Smith Directive remain live, because Defendants have not met their "heavy" "burden of demonstrating mootness."  *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (internal citations and quotations omitted).

---

[10] The Court does not dispute that each NPS park could recertify their e-bike policies pursuant to the Final Rule that is now in effect.  But there is no indication that this has occurred in this case, meaning that these 380 parks continue to operate under the authority of the Smith Directive.

In the interest of thoroughness, however, the Court will now review the status of each of the five claims brought in Plaintiffs' proposed supplemental complaint to ensure each presents a live controversy and that supplementation of the complaint as proposed would not be futile.

### a. Count I: Alleged Violation of the APA

Plaintiffs' first claim in its proposed supplemental complaint contends that both the Smith Directive and Final Rule were "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA.  Supp. Compl. ¶¶ 52.  Because this claim could withstand a motion to dismiss, the Court will grant Plaintiffs leave to supplement this claim in full.

Plaintiffs claim that the Smith Directive (and Final Rule) are arbitrary and capricious in light of aesthetic and safety concerns, *see* Supp. Compl. ¶¶ 28, 29, and otherwise not in accordance with law given the alleged NEPA and FVRA violations, *see* Supp. Compl. ¶¶ 39, 44–47.  These claims are not moot because if the Court finds them to have merit, it can grant effective relief by invalidating the park e-bike designations that continue under the Smith Directive's authority.

Plaintiffs' supplemented Count I also alleges that the Final Rule violates the APA. Defendants present no specific argument to address why Count I of the proposed supplemental complaint would be "futile" in this respect.  Mootness is not a concern as the Final Rule remains live.  It is the party opposing—here, the Plaintiffs'—burden to demonstrate why leave to supplement should not be granted.  *See LaPrade v. Abramson*, No. 97-cv-10, 2006 WL 3469532, at *3 (D.D.C. Nov. 29, 2006) (citing 3 James Wm. Moore et al., Moore's Fed. Prac. § 15.15[3] (3d ed. 1999)).  They fail to meet this burden.  The Court, therefore, finding Defendants'

assertions of mootness to be unwarranted, and given the lack of any other ground of futility, orders this claim to be supplemented in full.

### b.   Count II: Alleged Violation of NEPA

Plaintiffs' second claim in its supplemental complaint alleges that both the Smith Directive and Final Rule violate NEPA due to Defendants' ongoing failure to issue a contemporaneous environmental assessment of either the directive or Final Rule.  Supp. Compl. ¶¶ 54–58.  In arguing for futility, Defendants contend that because the Smith Directive has been superseded, conducting a NEPA analysis on a now defunct policy "would serve no purpose" and accordingly, must be found moot.  Defs.' MTD Reply at 8.[11]  In rebuttal, Plaintiffs reiterate the interrelated nature of the purported NEPA violation in the Smith Directive and the NEPA violation they claim is preserved in the Final Rule to argue that this claim is still live.  Pls.' MTD Opp'n at 14; *see also id.* at 13–18.   Plaintiffs have the better of the argument, and the Court agrees that because the Smith Directive is in turn used as a justification for the ongoing lack of NEPA compliance in the Final Rule, the validity of the initial NEPA determination remains a live issue.

The Court does not dispute Defendants' general contention—they are correct that numerous courts have held that a NEPA challenge to a policy that has been superseded or otherwise voided is typically moot.  *See, e.g., Theodore Roosevelt Conservation P'ship*, 661 F.3d at 79 (alleged NEPA violation brought against since superseded Record of Decision dismissed as moot, as the court could not take action regarding "a Record of Decision that has disappeared into the regulatory netherworld.") (citations omitted); *Fund for Animals*, 460 F.3d at 18 (NEPA

---

[11] Defendants do not present any claim-specific argument as to why Plaintiffs' NEPA claim for alleged violations in the Final Rule cannot proceed.  Accordingly, the Court focuses its attention on the mootness inquiry regarding the Smith Directive's NEPA claim.

claim dismissed as moot where the policy memorandum at issue had expired and was thus no longer in effect); *S. Utah Wilderness All. v. U.S. Dep't of the Interior*, 250 F. Supp. 3d 1068 (D. Utah 2017) (finding that where a permit was no longer operative, the alleged injury to Plaintiffs rendered by a NEPA violation "ha[d] evaporated."). Logically this conclusion follows, as declaring a superseded policy without any legal effect to be in violation of NEPA would "be wholly without effect in the real world." *Wyoming* v. *United States*, 674 F.3d 1220, 1230 (10th Cir. 2012).

However, the NEPA claim at issue here is again not the typical case, because the Smith Directive continues to have an operative effect on the Final Rule's NEPA compliance (or lack thereof). The D.C. Circuit has held that a final rule does not moot claims brought challenging a procedurally defective interim rule, when the final rule was dependent in some way on the validity of the interim rule. *See Union of Concerned Scientists v. Nuclear Regul. Comm'n*, 711 F.2d 370, 377 (D.C. Cir. 1983) (concluding that final rule did not moot claim based on interim rule prescribed without notice and comment, because final rule was predicated in part on the safety determination made in the interim rule, the validity of which consequently "remain[ed] a live issue which must be reviewed in some forum."); *see also Schering Corp. v. Shalala*, 995 F.2d 1103, 1105–06 (D.C. Cir. 1993) (noting that where a past agency policy document "served as a foundation for the [later] regulations," the Court may have more leeway to "reach back to the [preceding policy document] and issue a judgment on the meaning of the statute," even when it had since been superseded); *see also Am. Mar. Ass'n v. United States*, 766 F.2d 545, 554 n.14 (D.C. Cir. 1985) ("Although aspects of this litigation could also be resolved in a petition to review the final rule, [defendant's] issuance of that rule does not moot [plaintiff's] and the unsubsidized shipper's challenges, which are equally applicable to the final rule and the interim

rule.").  In sum, a claim is only moot when nothing turns on its outcome.  So when a party can show that a past agency rule or action has continuing consequences that inform the subsequent rule, this is sufficient to prevent a claim from being rendered moot.

It is precisely this situation that is now before the Court.  The Final Rule, when justifying why a categorical exclusion to NEPA applies, states that the rule only "codifies the decision made in the [Smith Directive] but does not change the regulatory treatment of e-bikes . . . in a way that would result in an expanded range of potential environmental impacts."  Final Rule at 69,186.  The Final Rule further justifies this position by noting that 380 NPS units already allow e-bikes pursuant to the Smith Directive, and that policy already "required those units to evaluate the environmental impacts of allowing e-bikes under NEPA."  But this characterization is optimistic at best.  The Smith Directive, while first ordering park superintendents to comply with NEPA, immediately thereafter appeared to absolve park superintendents of this responsibility by stating that the implementation of the e-bike policy would "ordinarily fall within the categorical exclusion" to NEPA's requirements.  Smith Directive at 4.  Indeed, it was this language and overall policy that Plaintiffs challenged in their first complaint.  *See* Compl. ¶¶ 62–66. Consequently, the Court shares Plaintiffs' concerns that Defendants' initial failure to comply with NEPA regulations in the Smith Directive has been "[b]ootsrapped" and used as a false justification for a continuing NEPA violation in the Final Rule.  Pls.' MTD Opp'n at 14, 17.  For this reason, contrary to Defendants' assertion, something very real "would be gained by doing a NEPA analysis on a now superseded policy," Pls.' MTD Reply at 8, because this finding directly informed the Final Rule's NEPA determination.  *See Union of Concerned Scientists*, 711 F.2d 397 ("Where superseding agency actions repeat the same alleged procedural error, they preserve, rather than moot, the original controversy.") (internal citation omitted).

As a result, Plaintiffs' NEPA violation claim brought against the Smith Directive presents a "live controversy of the kind that must exist if [the court] is to avoid advisory opinions on abstract questions of law," *Schering Corp.*, 995 F.2d at 1106, meaning mootness concerns are not implicated.  The Court grants Plaintiffs leave to file Count II of their proposed supplemental complaint in full.

### c. Count III and IV: Alleged Violations of the FVRA and NPS Organic Act

Plaintiffs' third and fourth claims challenge the issuance of the Smith Directive on the grounds that the NPS officials who issued and implemented the policy did not have proper authority under the FVRA and the NPS Organic Act to do so.  Supp. Compl. ¶¶ 60–64, 66–68. Plaintiffs contend that these claims continue to pose a live controversy even following the issuance of the Final Rule because the claims are "separate from merits of Smith Directive" and the Final Rule is a "FVRA-violating ratification of that Directive."  Pls.' MTD Opp'n at 18.  For the reasons described below, the Court finds Plaintiffs' FVRA and NPS Organic Act claims survive the issuance of the Final Rule, meaning Plaintiffs' proposed supplemental complaint for these claims is not futile.

The FVRA provides that "[a]n [FVRA violating] action that has no force or effect . . . may not be ratified."  5 U.S.C. § 3348(d)(2).  The FVRA's prohibition on ratification was designed to prevent the practice of a properly appointed official reissuing a decision taken in violation of FVRA provisions, exactly what is alleged to have occurred here.  *See SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 70 (D.C. Cir. 2015) (noting that the "FVRA renders actions taken by persons serving in violation of the Act void ab initio"), *aff'd*, 137 S. Ct. 929 (2017).  Plaintiffs argue that the Final Rule is a "FVRA-violating ratification of [the Smith] Directive."  Pls.' MTD Opp'n at 18.  Consequently, Plaintiffs' supplemented FVRA claim presents much the same

situation for mootness purposes as Plaintiffs' NEPA claim.  A determination of if the Final Rule was an impermissible FVRA ratification will turn on an evaluation of the Smith Directive's FVRA compliance.  This means, regardless of the superseding Final Rule, the Smith Directive continues to have "real world consequences" and for the purposes of the FVRA claim, "remains a live issue which must be reviewed in some forum."  *See Union of Concerned Scientists*, 711 F.2d at 377; *see also Schering Corp.*, 995 F.2d at 1105.  If the Final Rule ratified the Smith Directive, which is what is alleged in the proposed supplemental complaint, this would be enough to stave off mootness.

In response, Defendants contend that no ratification has occurred. They posit that the Final Rule "is a different action and differs in content," and catalog every difference between the two actions, noting that unlike the Smith Directive, the Final Rule underwent notice and comment rulemaking, formally amended NPS regulations, and grants park superintendents more latitude in interpreting the e-bike policy going forward.  Defs.' Leave Opp'n at 9.  The Court, however, is not convinced that this issue can be decided without reviewing the administrative record.  The Final Rule explicitly states that it "codifies the decision made in the [Smith Directive]."  Final Rule at 69,186.  Moreover, the text of the Final Rule preserves every individual park decision taken pursuant to the Smith Directive, stating that the 380 Park Units that have already complied with the Smith Directive require "no further action . . . to reauthorize[] the continued use of e-bikes under this regulation."  *Id*. at 69,176.  These two actions, taken together, suggest that the Final Rule may have ratified the substantive policy of the Smith Directive.  Accordingly, Plaintiffs' claims concerning the alleged FVRA violation of the Smith Directive remain live, and the Court grants leave to supplement the complaint in this regard.

Somewhat strangely, neither party addresses in detail Count IV of Plaintiffs' supplemental complaint in any of the numerous briefings before the Court.  This claim alleges that the NPS officials who issued and implemented the Smith Directive did not have proper authority under the NPS Organic Act to do so.  Supp. Compl. ¶¶ 66–68.  The Court finds that this claim survives the mootness attack from Defendants for the same reason already described in-depth above—because 380 NPS park units continue to allow e-bikes under the Smith Directive's authority, if the Court found the directive to be unlawful on the basis of a violation of the NPS Organic Act, it has an avenue to grant effective relief on this claim by voiding these e-bike approvals.  The Court thus grants Plaintiffs leave to file Count IV of their proposed supplemental claim in full.

### d.  Count V: Alleged Violation of FACA

Plaintiffs' final claim alleges that throughout 2018 and 2019 the NPS hosted a series of E-bike Partner & Agency Group meetings to receive advice and recommendations on what would eventually become the Smith Directive—meetings that were held in violation of the transparency and fairness requirements of FACA.  Supp. Compl. ¶¶ 70–73.  While Defendants do not explicitly argue that Plaintiffs' proposed supplemental complaint FACA claim is futile, they do posit in their motion to dismiss that because the working group in question has been disbanded and the Smith Directive superseded, this claim is moot (and thus, supplementation would be futile).  Defs.' MTD Reply at 11.  The Court disagrees, and finds that because effective relief remains available to Plaintiffs, their proposed supplemental claim here is not futile.

Once again, the Court begins its futility analysis by determining if the claim in question is moot—meaning it must ascertain if it remains able to grant effective relief.  Plaintiffs request in their supplemental complaint that this Court "[e]njoin any further meetings by Defendants or

their staff with the E-bike Partner and Agency Group absent full compliance with FACA[]." Supp. Compl. ¶ J.  They now also request that the Court declare that "[Defendants'] disregard of FACA was wrong and egregious, otherwise the agency will likely repeat it in similar contexts." Pls.' MTD Opp'n at 26.[12]  Because the Court remains able to grant at least some of the relief requested by Plaintiffs, this claim is not moot.  *See Calderon*, 518 U.S. at 150 ("[E]ven the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'") (citing *Mills*, 159 U.S. at 653).

The D.C. Circuit has repeatedly held that "FACA rights are enforceable even after an advisory committee has been disbanded."  *Cummock v. Gore*, 180 F.3d 282, 292 (D.C. Cir. 1999); *Judicial Watch, Inc. v. Nat'l Energy Pol'y Dev. Grp.*, 219 F. Supp. 2d 20, 32 (D.D.C. 2002) (noting "that relief can exist beyond the life of the committee . . .").  Accordingly, that both parties are in agreement that the E-bike Partner and Agency Group is no longer active does not, standing alone, prevent this claim from proceeding.  That said, the Court is somewhat skeptical that the injunction requested by Plaintiffs barring any future meetings of the disbanded group lies within its power to decree.  At least one court, when faced with a similar request, determined that "there is no reason to enjoin further meetings" of a group alleged to have been established in violation of FACA when the group had since been dissolved, mooting the issue.

---

[12] As Defendants accurately point out, neither Plaintiffs' original complaint (nor their proposed supplemental complaint) requests this type of declaratory relief on their FACA claim. *See* Defs.' Reply at 10.  The supplemental complaint does, however, request any "such additional relief as the Court deems just and proper."  Supp. Compl. ¶ L.  Because this sort of declaratory relief has been recognized as an appropriate remedy for FACA violations in this Circuit, the Court concludes it is an appropriate remedy to consider here.  *See, e.g.*, *Physicians Comm. for Responsible Med. v. Glickman*, 117 F. Supp. 2d 1, 5 (D.D.C. 2000) (awarding declaratory relief in the form of a statement that the agency failed to comply with FACA, even where the committee had since disbanded and released all pertinent records); *Byrd v. U.S. E.P.A.*, 174 F.3d 239, 244 (D.C. Cir. 1999) (awarding declaratory relief as it "would afford [P]laintiff some relief.").

*See W. Org. of Res. Councils v. Bernhardt*, 412 F. Supp. 3d 1227, 1244 (D. Mont. 2019).  And

Plaintiffs' suggestion that the E-bike Group's illegal meetings (or that of a similar group) could

resume appears highly unlikely, given that the NPS has promulgated the Final Rule on e-bikes

(as have the other land management bureaus within the Department of the Interior) meaning

there would be no reason for the group to reconvene.  Defs.' MTD Reply at 14.  However, the

Court need not conclusively reach this issue because relief for Plaintiffs remains available on

alternative grounds.

The D.C. Circuit has held that a claim for declaratory relief under FACA also remains

viable—and thus the claim live— even after the termination of the group in question.  *Byrd*, 174

F.3d at 244; s*ee also Cummock*, 180 F.3d at 282 (holding that a declaratory judgment can be an

appropriate remedy for a FACA violation).  This is because a declaratory judgment can then be

used by plaintiffs as "ammunition for [their] attack on the Committee's findings."  *Glickman*, 117

F. Supp. 2d at 5 (internal quotation marks and citation omitted)); *see also NAACP Legal Def. &*

*Educ. Fund, Inc. v. Barr*, No. 20-cv-1132, 2020 WL 5833866, at *9 (D.D.C. Oct. 1, 2020)

(granting declaratory relief as "[Plaintiff] can point to the Commission's imbalance and failure to

satisfy FACA's procedural requirements in challenging the report *or future agency actions*.")

(emphasis added); *Ctr. for Arms Control & Non-Proliferation v. Pray*, 531 F.3d 836, 839 n*

(D.C. Cir. 2008) (noting that a declaration of the Plaintiffs' legal rights "could form the basis of

an injunction against the [Defendants], which would redress [their] claimed injury").  Here,

Plaintiffs' request for declaratory relief stating that the E-bike Group violated FACA could

provide them with the same sort of "ammunition" to attack NPS's resultant e-bike policies,

including the Final Rule.  Accordingly, because the Court remains able to provide this

declaratory relief, Plaintiffs' FACA claim is not moot, and supplementation is not futile.[13] The

Court grants Plaintiffs leave to add their FACA claim in full.

  *e. Plaintiffs' Motion to Complete or Supplement the AR Regarding Their FACA Claim*

   The continued live nature of Plaintiffs' FACA claim means that one more pending

motion warrants this Court's attention.  Prior to the motion to dismiss briefing, Plaintiffs filed a

Motion to Complete or Supplement the Administrative Record ("Pls.' Supp. Mot."), ECF No. 11,

contending that "three key documents" must be added to the AR in support of their FACA claim.

Pls.' Supp. Mot. at 3.  Defendants oppose the motion, arguing that because the three requested

documents were created after the Smith Directive was issued they are post-decisional and need

not be included in the current AR.  Defs.' Opp'n to Pls.' Mot. to Supp. the AR ("Defs.' Supp.

Opp'n") at 2–3.  Plaintiffs retort that Defendants misunderstand the nature of their independent

FACA claim, which they assert targets the decision to host the FACA-violating E-Bike Group

meetings generally, not simply the issuance of the Smith Directive following the meetings.  Pls.'

Reply to Defs.' Opp'n to Pls.' Supp. Mot. at 4, ECF No. 17.  In short, the parties' disagreement

hinges on a dispute over the proper scope of Plaintiffs' now supplemented FACA claim.  As a

result, given the recent developments in this case, the Court finds that a ruling on this motion

would be premature and perhaps unnecessary.  It appears highly likely that the Court's grant of

---

   [13] Defendants also argue that Plaintiffs' FACA claim "is dependent on a challenge to the [Smith Directive]" and that because the Final Rule went through notice and comment any FACA deficiencies present in the original policy have since been cured.  Defs.' MTD at 11.  They provide no authority for this proposition, likely because as far as this Court can tell, this issue has not been reached by any court.  Given that Plaintiffs remain able to argue that as a result of this alleged FACA violation the integrity of NPS decisionmakers was compromised, which could have been codified in the Final Rule, this Court's declaratory relief would still provide "ammunition" that could be used to attack the NPS's e-bike rule in its final form.  *See Glickman*, 117 F. Supp. 2d at 5 ("How effective such ammunition [in the form of declaratory relief] will be is not for this Court to say.").

leave to Plaintiffs to file their supplemental complaint has mooted or at least substantially

changed the current posture of this issue.  Indeed, in opposing this motion Defendants conceded

that the three documents in dispute could likely be included in an AR compiled to challenge the

Final Rule, as will now be required.  *See* Defs.' Supp. Opp'n at 13–14 ("If and when Plaintiffs do

file a suit about the. . . [F]inal [R]ule, then the non-deliberative October emails may belong in the

administrative record for that case.").  Accordingly, the Court denies this motion without

prejudice at this time.

### f.  Prudential Mootness

Defendants argue in their motion to dismiss that to the extent any claims survive the

Court's constitutional mootness analysis, they must be dismissed under the doctrine of prudential

mootness.  Defs.' MTD at 15–16.  The Court disagrees, and finds that the application of the

prudential mootness doctrine here would be an inappropriate exercise of the Court's

discretionary equitable powers.

Prudential mootness concerns a court's discretion to decline to grant equitable relief.

*Penthouse Int'l, Ltd. v. Meese*, 939 F.2d 1011, 1019–20 (D.C. Cir. 1991).  For "[e]ven when a

case is not moot in the Article III sense, it will sometimes be 'so attenuated that considerations of

prudence and comity for coordinate branches of government counsel the court to stay its hand,

and to withhold relief it has the power to grant.'"  *Gordon v. Holder*, 85 F. Supp. 3d 78, 81–82

(D.D.C. 2015) (quoting *Chamber of Commerce of U.S. v. U.S. Dep't of Energy*, 627 F.2d 289,

291 (D.C. Cir. 1980)).  Prudential mootness is typically applied "[w[here it is uncertain that

declaratory relief will benefit the party alleging injury" or to avoid a "constitutional issue of first

impression."  *Penthouse Int'l.,* 939 F.2d at 1020.  Neither category properly applies here.  There

is no unique outstanding constitutional question, and while Plaintiffs' do request declaratory

relief, they have several available paths to meaningful relief.  As a result, this case is not one where such a use of this Court's discretion to withhold declaratory relief is justified.  The Court therefore declines to apply the prudential mootness doctrine to the case at hand.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Stay Pending Rulemaking, ECF No. 10, is **DENIED AS MOOT**; Plaintiffs' Motion for Leave to File Surreply, ECF No. 18, is **DENIED AS MOOT**; Plaintiffs' Motion to Modify Briefing Schedule, ECF No. 20, is **DENIED**; Defendants' Motion to Dismiss, ECF No. 21, is **DENIED**; Plaintiffs' Motion for Leave to File Supplemental Complaint, ECF No. 25, is **GRANTED**; and Plaintiffs' Motion to Complete or Supplement the Administrative Record, ECF No. 11, is **DENIED WITHOUT PREJUDICE**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 30, 2021                                    RUDOLPH CONTRERAS
                                                         United States District Judge