## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |  |
|---|---|---|---|
| PUBLIC EMPLOYEES FOR | : | | |
| ENVIRONMENTAL | : | | |
| RESPONSIBILITY, *et al.* | : | | |
| *Plaintiffs*, | : | Civil Action No.: | 19-3629 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 42, 45, 50 |
| | : | | |
| NATIONAL PARK SERVICE, *et al.*, | : | | |
| | : | | |
| *Defendants*. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT; GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SURREPLY

## I.  INTRODUCTION

In mid-2019, the National Park Service ("NPS") released a policy directive instructing park superintendents to allow e-bikes to be used in the same areas where traditional bicycles were used, which it followed up a year later with a notice-and-comment rulemaking amending the NPS regulations to address e-bikes.  Plaintiffs Public Employees for Environmental Responsibility, Wilderness Watch, the Environmental Action Committee of West Marin, the Marin Conservation League, Save Our Seashore, Amy Meyer, Phyllis Koenig, and David Perel brought this action against NPS, the United States Department of the Interior, the acting Director of the National Park Service, and the Secretary of the Interior, challenging both the policy directive and the Final Rule on various fronts.  Suppl. Compl. ¶¶ 9–18, ECF No. 34.

Plaintiffs assert claims under the Administrative Procedure Act, National Environmental Protection Act, Federal Vacancies Reform Act, Federal Advisory Committee Act, and NPS

Organic Act.[1]  *See* Pls.' Mem. P. & A. Supp. Mot. Summ. J. ("Pls.' Mot."), ECF No. 42-1;

Defs.' Combined Mem. Supp. Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("Defs.' Mot."),

ECF No. 45-1; Combined Mem. Supp. Pls.' Opp'n to Defs.' Mot. Summ. J. & Reply to Defs.'

Opp'n to Pls.' Mot. Summ. J. ("Pls.' Reply"), ECF No. 46; Defs.' Reply Mem. Supp. Mot.

Summ. J. ("Defs.' Reply"), ECF No. 49.  For the following reasons, the Court will grant

summary judgment to Defendants on the majority of those claims but grant summary judgment

to Plaintiffs on the National Environmental Protection Act claim and remand without vacatur to

the agency.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The National Park System is made up of 423 national parks across the United States and

its territories, ranging from vast wilderness areas to urban historical monuments.  Defs.' Mot. at

1.  The statutory responsibility of the NPS is to administer this diverse and priceless system in

such a way that will "conserve . . . and . . . provide for the enjoyment of the scenery, natural and

historic objects, and wild life in such manner and by such means as will leave them unimpaired

for the enjoyment of future generations."  54 U.S.C.A. § 100101(a).  As relevant to this case,

bicycling is a common way that visitors enjoy the National Park System.

In August 2019, the Secretary of the Interior signed Secretarial Order 3376 entitled

"Increasing Recreational Opportunities through the use of Electric Bikes" ("Secretarial Order")

---

[1] Defendants do not contest that Plaintiffs have standing to bring this action, and Plaintiffs have satisfied their burden of establishing standing by attaching declarations that "adequately allege injury in fact" by "aver[ring] that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity," specifically, the allowance of e-bikes in national parks.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  Those alleged injuries are also directly traceable to the challenged Smith Directive and Final Rule and would be meaningfully redressed by a decision on the merits in their favor.

to address the use of e-bikes on lands managed by the United States Department of the Interior, including the National Park System.  *See* Suppl. Compl. ¶ 30; AR0915–17, Order 3376 § 3, Dep't Interior (Aug. 29, 2019) ("Secretarial Order").  Electric bicycles, or e-bikes, look much like traditional bicycles and can be pedaled in the regular manner, but are also equipped with a motor that can power the movement of the wheels and allow riders to obtain higher speeds with less physical exertion than traditional bicycles.  Suppl. Compl. ¶ 27; Secretarial Order § 3. The Secretarial Order defined "e-bikes" and set a general policy that e-bikes "shall be allowed where other types of bicycles are allowed" and "shall not be allowed where other types of bicycles are prohibited."  Secretarial Order § 4.  The Secretarial Order also directed NPS to develop a proposed rule in accord with the Order.  *Id.* § 5(a)(iv).

The very next day, NPS Deputy Director P. Daniel Smith issued a policy memorandum ("Smith Directive"), acknowledging that e-bikes were "appearing in national parks with greater frequency" and addressing the use of e-bikes on NPS lands.  Suppl. Compl. ¶ 32; AR0918–21, Policy Mem. 19-01, Dep't Interior (Aug. 30, 2019) ("Smith Directive").  Deputy Director Smith explicitly issued the policy while "[e]xercising the [a]uthority of the [NPS] Director."  Smith Directive at 1.  The Smith Directive's stated intent was "to allow e-bikes to be used for transportation and recreation in a similar manner to traditional bicycles."  *Id.* at 3.  It also directed park superintendents to update their park compendium to include the definition of e-bike and the statement that "E-bikes are allowed in [insert name of park] where traditional bicycles are allowed" and "prohibited where traditional bicycles are prohibited," among other updates, "as soon as possible, but no later than 30 days" from the issuance of the Directive or the introduction of e-bikes in the park.  *Id.* at 4.

NPS also undertook a notice-and-comment period pursuant to the APA in the following year, eventually publishing a final rule on e-bikes. *See* 85 Fed. Reg. 19,711 (Apr. 8, 2020) (proposed rule); 85 Fed. Reg. 69,175 (Nov. 2, 2020) (final rule) (codified at 36 C.F.R. pts. 1 & 4). The Final Rule differed from the Smith Directive in a few ways. First, the Final Rule amended NPS Regulation 36 C.F.R. § 1.4 to add a new category of "electric bicycle" and exclude e-bikes from the definition of "motor vehicle." 85 Fed. Reg. at 69,177. In contrast, the Smith Directive had simply changed its interpretation of NPS's existing regulations to conclude that e-bikes did not fall into the category of "motor vehicles." Smith Directive at 2. The Final Rule tweaked its definition of e-bikes to include devices with a motor "of not more than 750 watts" rather than motors of "less than 750 watts" in order to encompass e-bikes with an exactly 750-watt motor. 85 Fed. Reg. at 69,177. The Final Rule also used more permissive language than the Smith Directive, providing that e-bikes "may be allowed on park roads, parking areas, and administrative roads and trails that are otherwise open to bicycles," *id.* at 69,188, whereas the Smith Directive indicated to park superintendents that "[e]-bikes are allowed where traditional bicycles are allowed," Smith Directive at 2. Finally, the Smith Directive stated that the use of the electric motor "to move an e-bike without pedaling" was prohibited except in areas where motor vehicles were otherwise permitted, *id.* at 4, but the Final Rule relaxed that requirement to prohibit "exclusively using the electric motor to move an e-bike without pedaling *for an extended period of time*," 85 Fed. Reg. at 69,177 (emphasis added).

The text of the Final Rule states that, "once effective, [the Final Rule] will supersede and replace [the Smith Directive]." *Id.* at 69,177. Despite this statement, as this Court pointed out in its prior opinion, the Smith Directive continued to have ongoing policy consequences because 380 park units had already implemented the Smith Directive's e-bike policy and were

specifically exempted from any requirement for further action to recertify the use of e-bikes in those parks. *See Pub. Emps. for Env't Resp. v. Nat'l Park Serv.*, No. 19-cv-3629, 2021 WL 1198047, at *3 (D.D.C. Mar. 30, 2021) [hereinafter "*PEER I*"]. The Court therefore granted Plaintiffs leave to file a supplemental complaint and denied Defendants' motion to dismiss, which had sought to dismiss the complaint as moot in light of the Final Rule. *Id.* at *4, *18.

After that opinion, the NPS Deputy Director of Operations Shawn Benge issued yet another memorandum on e-bike use on June 30, 2021. *See* Attach. 1 of Decl. John Calhoun Supp. Defs.' Mot. Summ. J., Ex. A of Defs.' Reply ("Benge Mem."), ECF No. 49-1.[2] That memorandum specifically required the superintendents of the parks that had updated their park compendiums to authorize e-bike use pursuant to the Smith Directive to "reconsider whether, where, and under what conditions e-bike use should be allowed on trails or administrative roads" consistent with the Final Rule and to either make appropriate changes or recertify their previous actions in the park compendium. *Id.* at 2. It required those actions to be taken "as soon as practicable" and no later than September 28, 2021. *Id.* at 3. The Benge Memorandum further specified that changes or recertification must comply with NEPA and must either document why a categorical exclusion is appropriate or conduct an environmental assessment if appropriate. *Id.* at 2–3. To assist with the superintendents' decision-making process, NPS followed up with a literature review of relevant e-bike studies and key findings in August 2021. *See* Attachs. 2–3 of

_____

[2] The Plaintiffs object to Defendants' reliance on the Benge Memoranda because they were submitted without an accompanying declaration providing for foundation and authenticity and do not form part of the administrative record. Pls.' Reply at 2–4. Although Defendants also argue that the memos would be admissible evidence in that form as self-authenticating domestic public documents under Federal Rule of Evidence 902(1)(A), Defs.' Reply at 2 n.1, the Court need not decide that issue because in any event Defendants also resubmitted the memos along with a declaration certifying their authenticity in their Reply, *see* Decl. John Calhoun Supp. Defs.' Mot. Summ. J., Ex. A of Defs.' Reply ("Calhoun Decl."), ECF No. 49-1.

Decl. John Calhoun Supp. Defs.' Mot. Summ. J., Ex. A of Defs.' Reply ("2021 Lit. Rev."), ECF
No. 49-1.  The declaration from John Calhoun, submitted by NPS with its Reply, likewise
testifies that all park units subject to the Benge Memorandum have completed that
recertification, and that at least six of them in fact "made substantive changes" to their e-bike
policy.  Calhoun Decl. ¶¶ 10–12.

### III.  LEGAL STANDARD

In a typical case, a court may grant summary judgment to a movant who "shows that
there is no genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law."  Fed. R. Civ. P. 56(a).  But when assessing administrative action, at the summary
judgment stage "the district judge sits as an appellate tribunal," *Am. Bioscience, Inc. v.
Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), limited to determining whether, as a matter of
law, the evidence in the administrative record supports the agency's decision, *Citizens for
Responsibility & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013).  "In the APA
context, summary judgment is the mechanism for deciding whether, as a matter of law, an
agency action is supported by the administrative record and is otherwise consistent with the APA
standard of review."  *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 93 (D.D.C.
2020).

Under the APA, a reviewing court may set aside agency action if it is "arbitrary,
capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).
Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has
not intended it to consider, entirely failed to consider an important aspect of the problem, offered
an explanation for its decision that runs counter to the evidence before the agency, or is so
implausible that it could not be ascribed to a difference in view or the product of agency

expertise." *Motor Vehicle Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43 (1983).

"Although this inquiry into the facts is to be searching and careful, the ultimate standard of

review is a narrow one.  The court is not empowered to substitute its judgment for that of the

agency." *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

## IV.  ANALYSIS

### A.  Mootness

Defendants first argue that any challenges to the Smith Directive are now moot because

as of September 28, 2021, it no longer has any real-world impact.  Defs.' Mot. at 18; Defs.'

Reply at 4.  Crucial to this Court's prior holding was the fact that some number of parks

continued to authorize e-bike use under the Smith Directive rather than the Final Rule, meaning

that the Court retained the authority to grant meaningful relief if the Smith Directive was

invalidated.  *See PEER I*, 2021 WL 1198047, at *12.  But the Benge Memorandum specifically

directed that the remaining group of park units which had authorized e-bike use on trails and

administrative roads in accordance with the mandatory language of the Smith Directive and had

not already revised that decision under the discretionary standard of the Final Rule to consider

the issue anew under the discretionary standard of the Final Rule and recertify or modify their

decisions.  Benge Mem. at 2.  Thus, Defendants argue that each park unit has now made a case-

by-case decision under the standards of the Final Rule, and an order from the Court invalidating

the Smith Directive would have no real-world effect.  Defs.' Reply at 4–5.

To make that argument, Defendants rely on the factual declaration of John Calhoun,[3]

who attests that the NPS Environmental Quality Division identified 122 park management units

_____

[3] Plaintiffs take issue with the Defendants' filing of a new fact declaration with their
Reply brief and seek leave to file a Surreply in response.  *See* Pls.' Mot. Leave to File Surreply to
Defs.' Reply Mem. Supp. Mot. Summ. J. ("Surreply Mot."), ECF No. 50.  This point is well

whose compendiums allowed for e-bike use under the Smith Directive rather than the Final Rule. Calhoun Decl. ¶ 8.  Calhoun avers that "for all 122 NPS management units, the superintendent, or their proxy, has either certified that the decision to allow or disallow e-bikes on administrative roads or trails under the discretionary standard in the Rule has been documented in the superintendent's compendium, or [Calhoun has] independently verified that the decision has been so documented." *Id.* ¶ 10.  Of those, he declares that at least six superintendents made "substantive changes to their previous decisions regarding e-bikes," including two who decided to disallow e-bikes on trails and administrative roads.  *Id.* ¶ 11.  Plaintiffs urge the Court not to consider these assertions in Calhoun's declaration because, aside from his attestations of personal knowledge, it contains no documentary corroboration and Calhoun is not even assigned to the NPS Environmental Quality Division.  Pls.' Surreply to Defs.' Reply Filings in Supp. Mot. Summ. J. ("Surreply") at 2, ECF No. 50-1.

Although judicial review of an agency action at the summary judgment stage is generally limited to the administrative record, the Court may look beyond the administrative record to determine whether a case has become moot, an issue that implicates its jurisdiction to hear the case.  *See Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1010 (D.C. Cir. 2001) (ordering supplemental briefing on mootness in light of a new rule that took effect after oral

---

taken, given that a surreply is appropriate where "the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001).  Nor did Defendants oppose Plaintiffs' motion to file a surreply.  *See* Surreply Mot. at 3 n.1 (representing that "Federal Defendants do not object to Plaintiffs filing a sur-reply, provided it is 4 pages in length or less, and is limited to discussing facts articulated in paragraphs 8–12 of the Calhoun Declaration or responding to the argument . . . related to paragraphs 8–12 of the Calhoun Declaration.").  Although Plaintiffs' proposed surreply exceeded four pages, it substantively addressed only the Calhoun Declaration.  *See* Pls.' Surreply to Defs.' Reply Filings Supp. Mot. Summ. J. ("Pls.' Surreply"), ECF No. 50-1.  The Court therefore grants Plaintiffs' motion for leave to file a surreply and will deem the proposed surreply attached to that motion filed.

argument); *Relf v. Weinberger*, 565 F.2d 722, 726–27 (D.C. Cir. 1977) (dismissing a case as moot on appeal when the agency abandoned a challenged rule and expressed its intent to initiate a new rulemaking through counsel and letters to the court); *cf. Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (acknowledging that "it may sometimes be appropriate to resort to extra-record information").  Indeed, evidence demonstrating mootness will almost necessarily post-date the administrative record in any given case.  Plaintiffs' challenges to the declaration overlap with their substantive arguments, but they do not seriously suggest that the Benge Memoranda are not authentic.  *See generally* Pls.' Surreply.  The Court therefore overrules Plaintiffs' objection to the Calhoun Declaration and declines to strike it.

Because the Benge Memorandum required each of the park units where the Smith Directive still had an on-the-ground impact to reconsider the decision anew under the discretionary standard of the Final Rule, the Court agrees with Defendants that it no longer retains the authority "to grant 'any effectual relief whatever'" on the freestanding claims challenging the Smith Directive.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 79 (D.C. Cir. 2011) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)).  The Smith Directive has been superseded by intervening regulatory events, and the Court "can neither invalidate, nor require the [agency] to adhere to," a policy "that has disappeared into the regulatory netherworld."  *Id.* (internal quotations omitted).  The Smith Directive now constitutes the kind of "superseded, expired, or withdrawn agency polices or decision documents" that courts routinely find moot when challenged.  *PEER I*, 2021 WL 1198047, at *11.  Plaintiffs' concern that impacts of the Smith Directive linger because inertia will prevent those park superintendents from considering their recertification with a truly open mind, Pls.' Reply at 5, is

uncorroborated speculation that does not overcome the "presumption of regularity" that "attaches to the actions of Government agencies," *see U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).

Plaintiffs next attempt to salvage their challenges to the Smith Directive by arguing that the agency's intervening action falls into one of the recognized exceptions to mootness doctrine: "voluntary cessation" or "capable of repetition yet evading review." Pls.' Reply at 8–9. Under the former exception, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" if the defendant would be "free to return to his old ways." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (cleaned up). Under the latter exception, "the plaintiff must demonstrate that (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (cleaned up).

Neither applies here, and largely for the same reason—there is no reason to think that the same action will reoccur. "The 'same action' generally refers to 'particular agency policies, regulations, guidelines, or recurrent identical agency actions.'" *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 79 (quoting *Pub. Utilities Comm'n v. FERC*, 236 F.3d 708, 715 (D.C. Cir. 2001)). "An action is 'capable of repetition' only if there is a 'reasonable expectation that the same complaining party would be subjected to the same action again.'" *Id.* (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). Because the Final Rule by its terms superseded the Smith Directive, *see* 85 Fed. Reg. at 69,177, the Final Rule will continue to govern e-bike use absent a new notice-and-comment rulemaking. *See Friends of Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006) ("[W]e assume agencies follow their own

regulations . . . ."); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("It is well-established that an agency may not escape the notice and comment requirements . . . by labeling a major substantive legal addition to a rule a mere interpretation.").  Plaintiffs' generalized concern that NPS could reattempt a similar redefinition of its regulations without notice and comment is too speculative, and too disconnected from the facts of this case, to evade mootness.

Still, the fact that Plaintiffs' freestanding challenges to the Smith Directive are moot does not dispose of most of the present claims.  Plaintiffs have also challenged the Final Rule in its own right under both the APA and NEPA.  *See* Pls.' Reply at 5, 9.  This Court has already expressed concern that the "interrelated nature" of the Smith Directive and the Final Rule allowed NPS to "bootstrap" its initial NEPA determination into the Final Rule, and that "a final rule does not moot claims brought challenging a procedurally defective interim rule, when the final rule was dependent in some way on the validity of the interim rule."  *PEER I*, 2021 WL 1198047, at *14 (citing *Union of Concerned Scientists v. Nuclear Regul. Comm'n*, 711 F.2d 370, 377 (D.C. Cir. 1983)).  Similarly, Plaintiffs' FVRA claim turns on whether the Final Rule "ratified" the allegedly improper Smith Directive.  *Id.* at *15.  The Court retains the ability to grant declaratory relief on the FACA claim because a declaration would be meaningful relief in the sense if it could later provide "ammunition for [an] attack on the Committee's findings."  *Id.* at *16 (quotation omitted); *see also Byrd v. U.S. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999).[4]

---

[4] Although it is unclear what future attack Plaintiffs would or could bring, particularly in light of the Final Rule and the lack of any finalized work product from the group, "[h]ow effective such 'ammunition' will be is not for this Court to say."  *Physicians Comm. for Responsible Med. v. Glickman*, 117 F. Supp. 2d 1, 5 (D.D.C. 2000).

However, it will deny as moot the Organic Act claim because there are no remaining real-world effects of the Smith Directive.

## B.  Administrative Procedure Act (Count I)

The APA permits judicial review when "[a] person suffer[s] legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.  "[A]gency action," in turn, "includes . . . an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13).  An agency decision should be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).  "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 416.  The arbitrary and capricious standard of review is "very deferential," *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), and the Court must "generally defer to the wisdom of the agency as long as the action is supported by 'reasoned decisionmaking,'" *Bean v. Purdue*, No. 17-0140, 2017 WL 4005603, at *5 (D.D.C. Sept. 11, 2017) (quoting *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012)).  "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 789 F.2d 26, 37 (D.C. Cir. 1986) (en banc).

Although the Court determines that Plaintiffs' APA claim against the Smith Directive is now moot,[5] Plaintiffs have challenged the Final Rule under the APA as well.  Suppl. Compl.

---

[5] For that reason, the Court does not address Plaintiffs' arguments about whether the interpretation in the Smith Directive that excluded e-bikes from "motor vehicles" was arbitrary and capricious or impermissibly bypassed notice-and-comment rulemaking.  *See* Pls.' Mot. at 14–15; Pls.' Reply at 5–6.  Even if the interpretation of motor vehicle in the Smith Directive was

¶ 52.  Plaintiffs' challenges to the Final Rule are twofold: first, that the Final Rule improperly "codified" the procedurally defective Smith Directive, and second, that it was arbitrary and capricious because it failed to address significant comments and reached an implausible result. Pls.' Mot. at 17.  Plaintiffs' argument that the Final Rule should be vacated due to "its flawed procedural foundations" overlaps with the merits of its claims under the FVRA, FACA, NEPA, and NPS Organic Act, *see id.*, and will be addressed in those sections.  In this section, the Court will take up only Plaintiffs' freestanding APA challenges to the Final Rule, namely whether "the Final Rule's issuance was arbitrary and capricious because it failed to consider the massive countervailing evidence in the proposed rule docket" and was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 17–18 (second quotation from *State Farm*, 463 U.S. at 43).  After careful review of the record, the Court concludes that the agency did not act arbitrarily or capriciously in those respects.

"Agency action will be considered arbitrary or capricious unless an 'agency adequately responds to relevant and significant public comments.'" *Fla. Health Scis. Ctr., Inc. v. Becerra*, No. 19-cv-3487, 2021 WL 2823104, at *14 (D.D.C. July 7, 2021) (quoting *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011)) (alterations omitted).  An agency must do more than merely "[n]od[] to concerns raised by commenters only to dismiss them in a conclusory manner," *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020), *cert. granted sub nom. Arkansas v. Gresham*, 141 S. Ct. 890 (2020), but it "need not 'discuss every item of fact or opinion included in the submissions made to it,'" *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (quoting *Del. Dep't of Nat. Res. & Envt'l Control v. EPA*, 785 F.3d 1, 17 (D.C.

---

contrary to the controlling regulations, the Final Rule amended the regulatory definitions, and there is no remaining real-world effect of the Smith Directive.

Cir. 2015)).   Instead, its response "must be sufficient to enable the courts 'to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'"  *Id.* (quoting *Del. Dep't of Nat. Res.*, 785 F.3d at 17).

Plaintiffs argue that the agency failed to consider the sheer number of comments opposing the rule.  Pls.' Mot. at 17–19.  Although an agency must respond to the substance of significant comments, its determination need not be swayed by volume alone.  *See Nat. Res. Def. Council, Inc. v. U.S. EPA*, 822 F.2d 104, 122 n.17 (D.C. Cir. 1987) ("The substantial-evidence standard has never been taken to mean that an agency rulemaking is a democratic process by which the majority of commenters prevail by sheer weight of numbers . . . . The number and length of comments, without more, is not germane to a court's substantial-evidence inquiry.").

Nor is the substance of the comments quite as lopsided as Plaintiffs contend.  Many of the comments were from individuals pointing out the importance of increased accessibility in the national parks, which was emphasized in the agency's reasoning in the Final Rule and quantified in various studies in the administrative record.  *See, e.g.*, AR1161–71 (academic study on the health benefits of e-biking); AR1810 ("As the parent of an adult child with significant stamina and physical limitations, the use of an e-bike is essential for her enjoyment of parks."); AR1815 ("I have bad knees, an electric assisted bike allows me to once again enjoy cycling."); AR1822 ("My father is older and not physically capable of biking with a regular bike, but can do so with an electric bicycle."); AR1830 ("[T]hey just make it easier to enjoy riding for the rider, especially for someone like me who's physically not able to ride a regular bicycle (I have cancer and chronic fatigue syndrome.)"); AR1850 ("I'm a senior citizen with MS and because of balance and stamina issues, I'm not able to ride a regular bike.").

Other comments expressed mixed and nuanced views, such as opposing only one part of the rule or how it might apply in particular contexts. *See, e.g.*, AR1813 ("I think that e-bikes should be allowed in parks, however there should be more strict rules applied to them than to regular bikes."); AR1818 ("I want to strongly encourage the use of *Class 1* ebikes in our National Parks." (emphasis added)); AR1834–35 ("If there are lasting concerns about class 3 ebikes, perhaps it can be considered that class 3 is only allowed on bike lanes/roads, but not banned from NPS altogether . . . . Congested areas . . . could also institute a mandatory walk-your-bike policy as is found in most university environments."); AR1837 ("While I appreciate . . . that e-bikes increase access for some to experience the parks[,] I strongly believe they should be limited to paved surfaces and not allowed onto narrow dirt trails."); AR1849 ("I would suggest that Park Superintendents have the flexibility to post reduced speeds as appropriate and necessary where ebikes are allowed."); AR1898 ("I am a prop[on]ent of ebike access to trails but with limits.").

Plaintiffs do not point to a specific concern about e-bikes that was wholly ignored by NPS, and the Final Rule directly addressed the key concerns raised in the opposing comments. *See, e.g.*, 85 Fed. Reg. at 69,180–81 (addressing concerns about potential overcrowding or conflict with existing uses of trails); *id.* (addressing the cumulative impact of increased e-bike use on wildlife and trails); *id.* at 69,181 (addressing concerns about safety due to the higher speeds e-bikes are capable of reaching); *id.* at 69,183 (addressing the suggestion that conflicting state laws on e-bikes should apply where the park rule is less restrictive).  Plaintiffs' argument is not that the agency failed to respond to the public comments, but rather that its responses were inadequate.

In particular, Plaintiffs take issue with the portion of the Final Rule that only prohibits "using the electric motor exclusively to move an electric bicycle for an extended period of time" on the grounds that numerous comments expressed concern with the enforceability of this provision.  Pls.' Mot. at 18–19.  But NPS had specifically requested input on this issue, 85 Fed. Reg. at 19,714, and responded to those comments in detail, saying:

> The NPS acknowledges that the aspects of the rule cited by the commenters may pose certain enforcement challenges.  However, those challenges are not unique. They regularly arise in the context of enforcing laws that govern recreational use of park areas.  For example, regulations governing use of off-road vehicles at 36 CFR 4.10 prohibit operation of an off-road vehicle in a manner that causes unreasonable damage to the surface of a park road or route.  Determining when a violation of this regulation occurs can be fact-specific, requiring the exercise of specialized judgment on the part of law enforcement officers.   Similarly, determining whether a violation of the prohibition on extended use of throttle power without pedaling occurs will involve the exercise of specialized skill, training, and judgment by law enforcement officers.  Based on its experience enforcing other regulations that condition how the public recreates on public lands, the NPS believes that law enforcement officers have the expertise necessary to properly exercise their discretion to enforce the limitations on how Class 2 e-bikes may be used in a reasonable manner that ensures protection of public health, safety, and resources and users of the public lands.  The NPS has also modified the regulatory text to make clear that using the throttle on a Class 2 e-bike without pedaling is only prohibited if it is done for an extended period of time.  This will help law enforcement officials focus only on the more egregious cases of users using the throttle to move Class 2 e-bikes without pedaling.
>
> With respect to differentiating among traditional bicycles and e-bikes, and among classes of e-bikes, the NPS notes that 28 states require e-bikes to have a label that displays the class, top assisted speed, and power outlet of the electric motor.  Some e-bikes can be differentiated from traditional bicycles by simple observation.  In other cases, the NPS expects that its law enforcement officers will use their specialized skill, training, and judgment to enforce this requirement even if the e-bike is not labeled through observation of riding behaviors, questioning, or other means of investigation.  Identifying violations of NPS regulations that occur at speed is not a novel challenge for NPS law enforcement officers.  These individuals are tasked on a daily basis with enforcing speed limits and equipment and operational requirements for the use of motor vehicles and vessels used within remote park areas.

85 Fed. Reg. at 69,181–82.

An agency must "adequately explain" its reasoning, but courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (second quotation from *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  NPS's response to enforcement concerns considered the important elements of the problem, explained why it chose to maintain the provision, and even added the "extended" language to assuage concerns about enforceability. The explanation may have sped through the agency's reasoning faster than Plaintiffs desired and reached a different destination, but it sufficiently clarified the path the agency took.  That is enough to withstand judicial scrutiny under the APA.  Accordingly, the Court grants summary judgment to the Defendants on the freestanding APA claims in Count I.

### C.  Federal Vacancies Reform Act (Count III)

The Federal Vacancies Reform Act, or FVRA, is the current statutory framework that gives "the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS [Presidential appointment and Senate confirmation] office without first obtaining Senate approval" as required by the Constitution.  *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017); *see also* 5 U.S.C. § 3345 *et seq.*  "An action taken by any person" acting outside the permissible limits of the FVRA "in the performance of any function or duty of a vacant office . . . shall have no force or effect."  5 U.S.C. § 3348(d)(1).  Not only does an action taken in violation of the FVRA have no force or effect, it "may not be ratified" even by a properly appointed official.  *Id.* § 3348(d)(2).  This prohibition on ratification "was designed to prevent the practice of a properly appointed official reissuing a decision taken in violation of FVRA provisions."  *PEER I*, 2021 WL 1198047, at *15 (citing *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929).

Therefore, if the Smith Directive is an action taken in violation of the FVRA and the Final Rule ratified the Smith Directive, the Final Rule would be an impermissible FVRA ratification. *Id.* Although the Smith Directive was enacted in violation of the FVRA, with the benefit of the Administrative Record, the Court determines that the Final Rule was not an impermissible "ratification" of the Smith Directive and accordingly grants summary judgment to Defendants on the FVRA claim.

1.   Whether the Smith Directive Violated the FVRA

P. Daniel Smith, a long-time public servant, assumed the position of Deputy Director of Congressional and External Relations of the National Park Service in early January 2018. AR0315–18. That position had consistently been one of either two or three Deputy Director positions within the National Park Service since at least 2016. *See* AR0131 (2016 NPS Organizational Chart); AR0213 (2017 NPS Organizational Chart); AR0277 (2018 NPS Organizational Chart); AR0335 (2019 NPS Organizational Chart). Because NPS has multiple Deputy Directors, none of the Deputy Directors is a "first assistant" who automatically assumes those duties in the vacancy of a Director as contemplated by the FVRA. *See* 5 U.S.C. § 3345(a)(1). Instead, the Secretary of the Interior designated the ability to exercise the authority of the NPS Director, along with other vacant positions within the Interior, in a series of amendments to Secretarial Order 3345 "to ensure uninterrupted management and execution of the duties of these vacant non-career positions during the Presidential transition pending Senate-confirmation of new non-career officials." *See, e.g.*, AR1606–07 (redelegation order). The first Deputy Director so designated was Mike Reynolds, who exercised the authority of the NPS Director for over a year before Smith assumed that authority. *See* AR1604–05 (redelegation

order preceding Smith's appointment); AR1608–10 (NPS press release announcing the transition from Reynolds to Smith).

Interior Secretary Zinke delegated authority to Smith to temporarily exercise the authority of the NPS Director on January 24, 2018, just two weeks after Smith had assumed the position of Deputy Director. AR1606–07. That redelegation was subsequently authorized multiple times. AR0911–14. Smith was exercising the authority of the NPS Director at the time he issued the Smith Directive, as did his successor and fellow Deputy Director David Vela and later successor Margaret Everson. *See* Smith Directive; Suppl. Compl. ¶ 46.[6] In fact, the position of NPS Director remained vacant until the Senate confirmation and swearing in of Director Sams in December 2021. *See* News Release: *Charles F. Sams III Sworn in as National Park Services Director*, Dep't Interior (Dec. 16, 2021), https://www.nps.gov/orgs/1207/director-chuck-sams-sworn-in.htm.

The purported authority for the redelegation in Secretarial Order 3345 was Reorganization Plan No. 3 of 1950, which "transferred to the Secretary of the Interior all functions of all other officers of the Department of the Interior" with limited exceptions, and authorized the Secretary to "make such provisions as he shall deem appropriate authorizing the

---

[6] Although only a handful of the redelegation orders were included in the Administrative Record, the Court may take judicial notice of official documents that are publicly available on government websites, such as Amendment 29 to Secretarial Order 3345, which redelegated the authority of the NPS Director to Deputy Director of Operations David Vela in September 2019, and Secretarial Order 3381, which redelegated the authority of the NPS Director to Everson in August 2020. Order 3345, Amendment 29, Dep't Interior (Sept. 30, 2019) https://www.doi.gov/sites/doi.gov/files/uploads/order-number-3345-amendment-number-29-508.pdf; Order 3381, Dep't Interior (Aug. 10, 2020) https://www.doi.gov/sites/doi.gov/files/elips/documents/so-3381-temp-del-dir-nps-508-compliant.pdf; *see also Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

performance by any other officer, or by any agency or employee, of the Department of the Interior of any function of the Secretary, including any function transferred to the Secretary by the provisions of this reorganization plan."  Reorganization Plan No. 3 of 1950, 15 Fed. Reg. 3174, *reprinted as amended in* 5 U.S.C. App. 1 §§ 1–2.

Defendants argue that Secretarial Order 3345 and its 32 amendments do not run afoul of the FVRA because the FVRA prohibits only the delegation of *exclusive* functions or duties of the vacant office position.  Defs.' Mot. at 55.  They point to the recent guidance of the D.C. Circuit that "[t]he FVRA . . . establishes that a function or duty is exclusive when it is . . . 'established by statute, and . . . required by statute to be performed by the applicable officer (and only that officer)' . . . . If Congress wants to make clear that a function or duty is exclusive, it may do so through clear statutory mandates."  *Stand Up for California! v. U.S. Dep't of Interior*, 994 F.3d 616, 622 (D.C. Cir. 2021) (quoting 5 U.S.C. § 3348(a)(2)(A)), *cert. denied*, 142 S. Ct. 771 (2022); *see also U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority to a federal officer . . . subdelegation to a subordinate federal officer . . . is presumptively permissible absent affirmative evidence of a contrary congressional intent.").  Thus, because the authority to issue policy directives is presumed non-exclusive and was affirmatively redelegated to Smith as a subordinate official, Defendants argue that no FVRA violation occurred.  Defs.' Mot. at 57–58.

Section 3348(d)(1) only voids action taken "in the performance of any function or duty of a vacant office."  5 U.S.C. § 3348(d)(1).  The FVRA defines the "function or duty" of a given office as one that is established by statute or regulation and is required by either the statute or a regulation in effect during the 180-day period prior to the vacancy to be performed "by the applicable officer (and only that officer)."  *Id.* § 3348(a)(2).  Some courts have found that certain

actions that were properly delegated to subordinate officials were not among the "functions and duties of a vacant office" that must be voided under § 3348(d). *See Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 59 (D.D.C. 2020) ("[B]ecause the Secretary delegated the authority to issue Department rules in 2003, that power is not vested exclusively in the Secretary and is therefore not the type of action that is voided under the FVRA."), *appeal dismissed*, No. 20-5369, 2021 WL 161666 (D.C. Cir. Jan. 12, 2021); *Kajmowicz v. Whitaker*, No. 2:19-cv-00187, 2021 WL 2200795, at *7 (W.D. Pa. June 1, 2021) (determining that only nondelegable duties may not be ratified and collecting cases).  The question in *Stand Up for California!* was whether a specific function was non-exclusive, and thus delegable even after the 210-day limit of the FVRA had elapsed.  994 F.3d at 622-23.  The D.C. Circuit, applying the presumption of redelegability, determined "that the regulation's text, when fairly read, contemplates redelegation" of the specific regulatory authority at issue in that case. *Id.* at 623.

But Reorganization Plan No. 3 does not itself delegate, or even refer to, specific duties.[7] This Court agrees with others that have considered the interplay between § 3348 and similarly broad delegation statutes and found that such a permissive reading would render the FVRA all but meaningless.  In a recent opinion, Chief Judge Howell acknowledged a similarly broad delegation power granted to the DHS Secretary but found it "unpersua[sive] that the delegable nature of the Secretary's rulemaking power makes the FVRA's anti-ratification provision wholly inapplicable to rules promulgated by an officer without lawful authority" in part because "[r]estricting the coverage of § 3348(d) to solely nondelegable functions and duties would also

---

[7] Nor is there any real argument that Smith issued the Directive in his proper capacity of Deputy Director, given that it was signed as being from the "Deputy Director Exercising the Authority of the Director."  *See* AR0918.

contravene Congress's stated purpose in enacting the FVRA." *Asylumworks v. Mayorkas*, No. 20-cv-3815, 2022 WL 355213, at *10 (D.D.C. Feb. 7, 2022).  Judge Moss also recently observed that "[b]ecause similar vesting and delegation statutes can be found throughout the Executive Branch, the logic of this position would cover all (or almost all) departments subject to the FVRA." *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 31 (D.D.C. 2020) (internal citation omitted), *appeal dismissed*, No. 20-5141, 2020 WL 5358686 (D.C. Cir. Aug. 25, 2020).

Here too, Defendants' argument would result in an end-run around the requirements of the FVRA, which provides "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency" that requires Presidential appointment with the advice and consent of the Senate.  5 U.S.C. § 3347(a).  The Reorganization Plan is not the kind of "agency-specific statute" that is "intended to apply alongside" the FVRA, such as by providing an alternative means of succession within an agency.  *See English v. Trump*, 279 F. Supp. 3d 307, 319 (D.D.C. 2018).  Rather, it is a general authority that must be interpreted in light of the more specific and limited authority in the FVRA.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (holding that where "a general authorization and a more limited, specific authorization exist side-by-side . . . . the [general/specific] canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one").  Statutory history lends support to that understanding, since when drafting the FVRA Congress was addressing a concern that "department heads had made frequent use of organic vesting and delegation statutes to assign the duties of [appointment and consent] offices to officers and employees, with little or no check from Congress." *L.M.-M.*, 442 F. Supp. 3d at 29.

In fact, the District of Montana reached the same conclusion when considering the use of the same Secretarial Order 3345 to temporarily appoint an acting director to the Bureau of Land Management. *Bullock v. U.S. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1125 (D. Mont. 2020). That court soundly rejected the same argument advanced by Defendants here, stating:

> Federal Defendants' argument attempting to distinguish an 'Acting Director' from an 'official performing the Director's duties under the Secretary's delegation' represents a distinction without a difference. Such arguments prove evasive and undermine the constitutional system of checks and balances. Federal Defendants' theory flies in the face of the constitutional design, the clear text of the FVRA that provides the 'exclusive' means for temporary appointment, and the history of Executive Branch evasion of the Appointments Clause that led Congress to pass the FVRA in the first place . . . . The President cannot shelter unconstitutional 'temporary' appointments for the duration of his presidency through a matryoshka doll of delegated authorities.

*Id.* at 1125–26. The same is true in this case.

In sum, the authority found in Reorganization Plan No. 3 does not allow the Secretary to evade the FVRA by "delegating" the entirety of the duties and functions for an appointment-and-confirmation office to an inferior official. Contrary to Defendants' assertion, Plaintiffs' argument is not based on a few errant misstatements in which Smith and others used the term "Acting Director." *See* Defs.' Mot. at 56, 58. Rather, it is premised on the fact that Smith performed all functions of the NPS Director office—including setting agency-wide policy with the Smith Directive—in a temporary capacity without complying with the FVRA. The position of NPS Director must be appointed by the President and confirmed by the Senate. 54 U.S.C. § 100302(a)(1). The Secretary of the Interior cannot avoid that statutory obligation through wordplay or by a wholesale redelegation of the entire office that lasts throughout a Presidential administration. "At some point, courts can and must play a role in policing 'acting' appointments that are effectively permanent." *Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 356 F. Supp. 3d 109, 153 (D.D.C. 2019), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019).

### 2.  Whether the Final Rule Ratified the Smith Directive

Although Smith was improperly filling the role of NPS Director at the time he issued the Smith Directive, he did not sign the Final Rule—the Senate-confirmed Assistant Secretary for Fish and Wildlife Services, George Wallace, did.  Defs.' Mot. at 60 (citing AR21044).  If the Final Rule violated the FVRA in its own right, that alone would render it invalid regardless of the question of ratification, 5 U.S.C. § 3348(d)(1), but Plaintiffs do not advance the argument that Wallace lacked the authority to issue the Final Rule or respond to the Government's assertion that Wallace had that authority, *see generally* Suppl. Compl.; Pls.' Reply.  Therefore, the Court assumes that Wallace acted with proper authority under the FVRA and must next determine whether the Final Rule "ratified" the unauthorized Smith Directive.

Prior to the current iteration of the FVRA, the D.C. Circuit had "deployed the ratification doctrine expansively to uphold an enforcement action initiated by an acting officer without first deciding whether the acting officer lawfully occupied his position."  *Asylumworks*, 2022 WL 355213, at *10 (discussing *Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*, 139 F.3d 203, 213–14 (D.C. Cir. 1998)).  In *Doolin*, the Circuit noted that it had "no doubt" that the properly appointed officer "made a detached and considered judgment" in adopting the Notice of Charges, and that it had previously upheld a similar ratification "despite misgivings about whether the new FEC had engaged in a 'real fresh deliberation.'"  *Doolin*, 139 F.3d at 213 (quoting *Federal Election Commission v. Legi–Tech, Inc.*, 75 F.3d 704 (D.C. Cir. 1996)).  In enacting the FVRA, Congress was in part motivated to create a meaningful sanction for noncompliance "in reaction to *Doolin*."  *Asylumworks*, 2022 WL 355213, at *11; *see also SW Gen., Inc.*, 796 F.3d at 70 ("Our decision in *Doolin* . . . prompted congressional action.").

Under the current version of the FVRA, a statement or directive that merely adopts an earlier action in identical form with no additional reasoning is clearly prohibited. *See Asylumworks*, 2022 WL 355213, at *11 (rejecting a ratification of this type by a subsequent Secretary); *see Behring Reg'l Ctr. LLC v. Wolf*, 544 F. Supp. 3d 937, 948 (N.D. Cal. 2021), *appeal dismissed sub nom. Behring Reg'l Ctr. LLC v. Mayorkas*, No. 21-16421, 2022 WL 602883 (9th Cir. Jan. 7, 2022) (rejecting Secretary's ratification of an FVRA-violating Final Rule because "actions" include "rule making" (quotations omitted)).  But Defendants argue that the ratification bar does not prohibit an agency from ever reconsidering the same topic anew and reaching a similar conclusion.  Defs.' Mot. at 59.  The Court agrees—with some additional clarification.

First, it is not enough that the agency decisionmaker simply reconsidered the matter anew with an open mind.[8]  In contexts where the strict ratification bar of the FVRA does not apply, "ratification can remedy a defect . . . 'when . . . a properly appointed official has the power to conduct an independent evaluation of the merits and does so.'"  *Wilkes-Barre Hosp. Co., LLC v. Nat'l Lab. Rels. Bd.*, 857 F.3d 364, 371 (D.C. Cir. 2017) (quoting *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 117–21 (D.C. Cir. 2015)); *see also Nat'l Lab. Rels. Bd. v. Newark Elec. Corp.*, 14 F.4th 152, 162 (2d Cir. 2021) ("Valid ratification occurs, therefore, when the [officer], possessing the authority necessary to undertake the ratified act at the time of ratification, and with full knowledge of the material facts, manifests an intent to ratify

---

[8] The portion of *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives* describing how the properly appointed Attorney General "independently familiarized himself with the rulemaking record and reevaluated those materials without any deference to [the] earlier decision," 920 F.3d 1, 12 (D.C. Cir. 2019) (cleaned up), does not provide guidance here because, as other courts have noted, the parties in that case had agreed that the ratification was valid and the question was not squarely presented, *see L.M.-M.*, 442 F. Supp. 3d at 33 (pointing out this aspect of *Guedes*).

the act in question." (citations omitted)).  Because, as these cases show, independent judgment in the later decision-making process is itself a requirement of ratification, a later action cannot avoid the ratification bar of the FVRA merely because it was independently reconsidered. Something more must be required.

The Court believes that the important distinction between a ratification prohibited by § 3348(d)(2) and a permissible new decision on the same topic is whether the second decision can fairly be said to be its own, different "action."  This understanding is grounded in the text of the statute, which states that "[a]n *action* that has no force or effect under paragraph (1) may not be ratified."  5 U.S.C. § 3348(d)(2).  The word "action" in turn references the definition of "agency action" in 5 U.S.C. § 551(13), *see* 5 U.S.C. § 3348(a)(1), which is defined as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act," 5 U.S.C. § 551(13).  Most of the items on the list are discrete events in which the decision is made based on certain facts at a particular point in time.  That is the most natural read of the word "action" as well.  *See* Merriam-Webster, https://www.merriam-webster. com/dictionary/action (defining "action" as "a thing done").

That understanding is further consistent with the background principles of ratification in the context of agency law found in the Restatement of Agency, which courts have long used to inform ratifications of administrative actions in the executive branch.  *See Fed. Election Comm'n v. NRA Pol. Victory Fund*, 513 U.S. 88, 98 (1994) ("The question is at least presumptively governed by principles of agency law, and in particular the doctrine of ratification."); *Nat'l Lab. Rels. Bd. v. Newark Elec. Corp.*, 14 F.4th at 161 ("[T]he Supreme Court reasoned that general principles of agency law . . . apply when dealing with ratification of agency action within the executive branch . . . .").  The Restatement of Agency defines ratification as "the affirmance of a

prior *act* done by another, whereby the act is given effect as if done by an agent acting with actual authority."  Restatement (Third) of Agency § 4.01(1) (2006) (emphasis added).  The Restatement further specifies that no ratification occurs "unless it encompasses the entirety of an act, contract, or other single transaction."  *Id.* § 4.07.

In contrast, Plaintiffs' argument focuses on the substantive policy position—something much broader.  As Defendants point out, Congress used markedly different language to prohibit later adoption of the same or similar substantive policy elsewhere in the same title as a penalty for violations of the Congressional Review Act.  Defs.' Mot. at 61 (citing 5 U.S.C. § 801(b)(2) ("A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued . . . .")).  By using the precise term "action," particularly against the backdrop of existing caselaw on ratification and the general principles of agency, Congress chose a narrower consequence in § 3348(d)(2).  Accordingly, the Court does not interpret that section to forever preclude an agency from reaching a similar result on the same issue of substantive policy, as long as the second decision resulted from a new procedural process distinct enough that it can fairly be considered a new "action."

Of course, the Court by no means forecloses the possibility that a ratification may occur where a technically distinct procedural "action" ratifies an earlier, impermissible one by rubberstamping it.  It was for precisely that reason that this Court previously held that further review of the record was necessary in order to determine whether the Final Rule ratified the Smith Directive within the meaning of the FVRA.  *PEER 1*, 2021 WL 1198047, at *15.  Now, however, after careful review of the administrative record, the Court believes the Final Rule was indeed a new deliberative action that reached a similar conclusion.

Of key importance, the procedural process that shaped the Final Rule was different from the one that shaped the Smith Directive.  Unlike the Smith Directive, which was issued just a day after Secretarial Order 3376 and interpreted the existing regulations, the Final Rule amended the regulations to add a new category for e-bikes.  *See* 85 Fed. Reg. at 69,175–77 (summarizing the sequence of events).  It also considered new material not evaluated prior to the Smith Directive, most importantly the voluminous public input in the form of comments on the proposed rule.  NPS requested—and received—input on the proposed rule in the form of public comments, such as specifically requesting comments on whether the restriction in the Smith Directive that "would prohibit an operator from using the electric motor to move an e-bike without pedaling" in areas where motor vehicles were not allowed was "appropriate or workable."  85 Fed. Reg. 19,711, 19,714; *see also* AR001642–21030 (excerpted public comments).  By the close of the comment period, the agency had "received more than 17,000 comments on the proposed rule."  85 Fed. Reg. at 69,177.  The scope of the record that informed the Final Rule was therefore much broader than the one that informed the Smith Directive.

The Court does not doubt that NPS independently and fairly considered this new evidence with an open mind.  In addition to the "presumption of regularity" that attaches to agency actions, *see Gregory*, 534 U.S. at 10, the Final Rule describes several places where the Rule was in fact revised in response to comments, *see* 85 Fed. Reg. at 69,179 ("In order to reduce the potential that this will create a perception that all three classes of e-bikes are allowed in all park areas, the NPS has revised the regulatory text in 36 C.F.R. 4.30(i)(1) to clarify that, in some cases, only certain classes may be allowed."); *id.* at 69182 ("The NPS has also modified the regulatory text to make clear that using the throttle on a Class 2 e-bike without pedaling is only prohibited if it is done for an extended period of time."); *id.* at 69183–84 ("The NPS

appreciates the suggestion by the commenter to refer to 'this chapter' in paragraph (i)(6) for the reasons stated by the commenter and has made this change in the final rule.").

The impact of the comments and additional review undertaken by NPS during the rulemaking process can also be observed in other substantive differences between the Smith Directive and the Final Rule, most importantly, the greater discretion provided to park superintendents in the Final Rule.  *See PEER 1*, 2021 WL 1198047, at *2 ("The Final Rule also uses more permissive language than the Smith Directive, providing that 'electric bikes *may* be allowed on roads, parking areas, administrative roads and trails that are open to bicycles.'  In contrast, the Smith Directive indicated to park superintendents that '[e]-bikes are allowed where traditional bicycles are allowed.'" (emphasis in original) (citations omitted)).  These substantive differences strongly suggest that the Final Rule is a new procedural action.  *Cf. Intercollegiate Broad. Sys., Inc.*, 796 F.3d at 121 (pointing out that "the new determination differs from the previous one on a number of points" not challenged by the parties).  If the Final Rule had dramatically changed course from the Smith Directive, such as by disallowing e-bikes or defining them as motor vehicles, there would be no debate over whether a "ratification" had occurred.  But a new "action" may also legitimately result in a similar, if not identical, policy.

Altogether, the Court believes that the Final Rule was an independently reached new decision on the same substantive topic, not an improper ratification of the Smith Directive.  Accordingly, it grants summary judgment to the Defendants on Count III.

### D.  Organic Act (Count IV)

Plaintiffs also argue that Smith's appointment as a Deputy Director violated the NPS Organic Act, which specifies only two Deputy Director positions, one for Operations and the other for Programs.  Pls.' Mot. at 32 (citing 54 U.S.C. § 100302(b)); *see also Adamski v.*

*McHugh*, 304 F. Supp. 3d 227, 236–37 (D.D.C. 2015) (describing the applicability of "*ultra vires*" claims to the administrative context).  Defendants counter that the statutory requirement of two Deputy Directors is a floor rather than a ceiling, and that if one of the three Deputy positions violated the Organic Act at all, it would be the most recent addition: The Deputy Director for Management and Administration position, which was created in fall 2016 and never held by Smith.  Defs.' Mot. at 61–62 (citing AR0177–91).

The Court need not resolve this issue because even if Plaintiffs' interpretation of the Organic Act is correct and Smith was acting *ultra vires*, there are no remaining effects of the Smith Directive alone that can now be remedied by the Court.[9]  Plaintiffs do not point to any anti-ratification provision similar to the one found in the FVRA that would allow the Court to set aside the Final Rule.  Accordingly, Plaintiff's claim under the NPS Organic Act is moot, and the Court will not address it.

### E.  Federal Advisory Committees Act (Count V)

The Federal Advisory Committees Act ("FACA"), 5 U.S.C. App. § 2, was enacted, in part, to ensure that the "creation, operation, and duration" of advisory committees "be subject to uniform standards and procedures; that Congress and the public remain apprised of their existence, activities, and cost; and that their work be exclusively advisory in nature."  *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 446 (1989).  Another goal was "to counter the fear that committees would be dominated by representatives of industry and other special interest groups seeking to advance their own agendas."  *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F.

---

[9] The Supplemental Complaint does not specifically request as relief a declaratory judgment about the meaning of the Organic Act independent from its claims about the Smith Directive and the Final Rule.  *See* Suppl. Compl. at 24–25.  Moreover, it is far from certain that Plaintiffs would have standing to assert such a claim untethered to any clear alleged injury.

Supp. 2d 28, 33 (D.D.C. 2006) (citing *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999)).

Advisory committees may only be established as specifically authorized by statute, the President,

or following a formal determination published in the Federal Register by an agency head.  5

U.S.C. App. 2 § 9(a).  To further facilitate transparency, a committee's meetings must be open to

the public with notice published in the Federal Register.  *Id.* § 10(a)(1–2).

Plaintiffs assert that "from late 2017 through late 2019 the NPS violated FACA by

convening meetings and teleconferences of the 'E-bike Partner & Agency Group,'" which was

conducted by invite only and comprised of private industry groups and agency employees.  Pls.'

Mot. 35–36.  Defendants concede that the group failed to comply with the statutory notice

requirements, *see* Defs.' Answer to Pls.' Am. Suppl. Compl. ¶ 41, and do not meaningfully

advance any argument that the E-bike Group's membership was fairly balanced across the

spectrum of industry and interest groups, *see* Defs.' Mot. at 46–47.  Instead, Defendants argue

that the E-bike Group was not an advisory committee at all, and thus FACA did not apply.  *Id.* at

47–49.

### 1.  Whether the E-Bike Group was an Advisory Committee

An "advisory committee" is "any committee, board, commission, council, conference,

panel, task force, or other similar group . . . which is . . . established or utilized by one or more

agencies, in the interest of obtaining advice or recommendations."  5 U.S.C. App. 2 § 3(2).  That

definition has been interpreted narrowly.  *Food & Water Watch v. Trump*, 357 F. Supp. 3d 1, 10

(D.D.C. 2018).  "[A]n advisory panel is 'established' by an agency only if it is actually formed

by the agency, and 'utilized' by an agency only if it is 'amenable to . . . strict management by

agency officials . . . .'"  *Byrd v. U.S. EPA*, 174 F.3d 239, 245 (D.C. Cir. 1999) (internal citations

omitted).  The definition does not extend to "executive consultations on policy issues with *ad*

*hoc* collections of private individuals who are not convened to render advice or recommendations, as a group." *VoteVets Action Fund v. United States Dep't of Veterans Affs.*, 992 F.3d 1097, 1101 (D.C. Cir. 2021) (internal quotations omitted).

One "important factor in determining the presence of an advisory committee [is] the formality and structure of the group." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993). Courts therefore look to whether the group has "an organized structure, a fixed membership, and a specific purpose." *Id.* For that reason, showing that "a particular group is a FACA advisory committee over the objection of the executive branch" is a steep hill to climb. *Id.*; *see also Food & Water Watch*, 357 F. Supp. 3d at 11 (noting that "although a de facto advisory committee may be a viable theory, at a minimum, it is difficult to prove"). Still, the E-bike Group had many of the hallmarks of a formal, organized advisory committee. It was coordinated and hosted by Interior officials for a specific purpose, primarily "promot[ing] interagency coordination on electric bicycle policies" and "[d]isscuss[ing] joint solutions and next steps to progress federal policy around electric bicycles." AR0430 (stating objectives in agenda for the first meeting); *see also* AR23043 ("These calls have served a beneficial coordination purpose between agencies and our official partnering entities on the e-bike topic."). Meetings were held quarterly, with in-person and dial-in options, agendas circulated in advance, and minutes and action items circulated afterwards. *See, e.g.*, AR0452–53 (email from an NPS employee thanking attendees of the first meeting and stating that "we plan to host these interagency meetings on a quarterly basis, to allow for continued coordination"); AR00428 (providing a draft agenda); AR00436–39 (email attaching minutes from the first meeting and "highlighting next steps").

Defendants emphasize that the E-bike group did not have a rigidly fixed membership, characterizing it as a "interagency group" of solely federal employees that occasionally invited private interest groups to participate in meetings. Defs.' Mot. at 48–49. That characterization is dubious. The administrative record demonstrates that the membership of the group expanded over time but consistently represented a core group of entities from both agencies and private interests, and that at least one private interest group—People for Bikes—was continually involved with nearly every aspect of the E-bike Group. *See, e.g.*, AR00447 (email between People for Bikes and NPS setting up a pre-meeting call and discussing the agenda); AR0466 (stating that "PeopleforBikes is willing to support us moving forward"). And while not strictly fixed, attendance and membership were closely monitored and managed by the agency. *See* AR00427 (discussing a Google doc of potential invitees); AR00429 (telling invitees to the first meeting that "if you have colleagues or peers in your agencies who work on . . . policies that pertain to electric bicycles, who would be interested in contributing to the conversation . . . . Please let me know who you have in mind and I will extend an invitation"); AR00475 (emailing about additional groups who "would like to be at the table" and asking "Would you like me to invite them to the call? Or should we discuss on the call the best way to proceed with these groups?"). On the other hand, the fluctuation in membership suggests that there may not have been a clear or consistent understanding of "a vote in or, if the committee acts by consensus, a veto over the committee's decisions." *In re Cheney*, 406 F.3d 723, 728 (D.C. Cir. 2005). Still, the membership of a group, like the other factors for identifying an advisory committee, will usually fall along "a continuum." *Ass'n of Am. Physicians & Surgeons, Inc.*, 997 F.2d at 915. When considering the semi-stable membership of the E-bike Group along with its established

purpose, regular meetings, and logistical coordination, the Court believes it falls closer to the end of the continuum where FACA applies.

Even more than the structure of the committee, the most important inquiry for FACA purposes is whether it "is asked to render advice or recommendations, *as a group*, and not as a collection of individuals." *Ass'n of Am. Physicians & Surgeons, Inc.*, 997 F.2d at 913 (emphasis in original).  The E-bike Group functioned as a collective unit.  *See* AR00464 (asking at an early stage "what are the top three priorities that our group can collectively work on together so that our time is well spent?"); AR00476 (recapping meeting by saying "[c]ollectively, we identified several next steps as we work toward refining our approach to e-bikes").  The administrative record likewise demonstrates the kind of close collaboration and teamwork that suggests the existence of an advisory committee.  *See VoteVets Action Fund*, 992 F.3d at 1104–05 (pointing to how the alleged committee "worked intensively as a group, including through in-person meetings, emails, and phone calls" and "operated and referred to themselves as a unit").

Defendants nevertheless argue that the E-bike Group was not an advisory committee because no finalized group advice was ever formally produced. Defs.' Mot. at 49.  This is true— although multiple versions of a draft White Paper on e-bikes were circulated, *see* AR00464, 490– 507, 545, 559–68, and 597–606, the paper appears to have been abandoned at some point in mid- July 2018.[10]  But a formalized group policy statement need not necessarily come to fruition before a committee is considered to be working as a group.  *See Ass'n of Am. Physicians & Surgeons, Inc.*, 997 F.2d at 913 (noting that an advisory committee need not necessarily give

---

[10] It was abandoned approximately within the same timeframe as the record first suggests that group members raised concerns about FACA non-compliance, although the group continued to meet for over a year after that.  *See* AR23040 (stating in an October 2019 email that "[a]bout a year ago, we raised the concern whether FACA applies to the e-bike interagency/partner group").

"consensus" advice, because some "are established presumably with the full expectation that the positions to be taken and the advice to be offered may well be sharply divided"); *Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98, 102 (D.D.C. 2013), *aff'd*, 559 F. App'x 1 (D.C. Cir. 2014) (determining that a stakeholder group was not an advisory committee where "the individuals attending these meetings varied significantly and there is no evidence that the defendants *had the goals* of attaining collective advice or collaborative work product from the stakeholder meetings" (emphasis added)).

The lack of a finalized policy recommendation is also relevant to Defendants' next argument: that Plaintiffs have not shown any direct link between the E-bike Group and the Smith Directive, let alone the Final Rule. Defs.' Mot. at 3. FACA covers committees that are "established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government." 5 U.S.C. App. 2 § 3(2). The Committee must therefore both provide advice on matters of executive policymaking, and it must provide them to the agency.

The case Defendants cite for support is distinguishable on this first ground. Defs.' Mot. at 52 (citing *Food & Water Watch*, 357 F. Supp. 3d at 14). In *Food & Water Watch*, the "group decisions or recommendations" at issue "pertained to planning the anticipated committee" and never reached the point of developing policy recommendations on the proposed topic. *Id.* at 13. The Court held that "FACA permits initial meetings . . . to determine the scope and mission of an advisory council before FACA applies" because "there can be no FACA obligation without some nexus between the group's purpose and the executive's policymaking goals." *Id.* at 14. Here, in contrast, the group discussions related to a matter of executive policymaking: the regulation of e-bikes on federal lands.

Not every group advising on policy will necessarily implicate FACA, however, if it does not provide policy advice and recommendations "for the President or one or more agencies or officers of the Federal Government."  5 U.S.C. App. § 3(2).  For that reason, in *Nat'l Anti-Hunger Coal. v. Exec. Comm. of President's Priv. Sector Surv. on Cost Control*, task forces subordinate to two advisory committees that were "intimately involved in the gathering of information about federal programs and the formulation of possible recommendations for consideration" were nevertheless outside the scope of FACA because they did "not provide advice directly to the President or any agency, but rather are utilized by and provide advice to only the Executive Committee, which then provides advice to the President or agency."  557 F. Supp. 524, 529 (D.D.C. 1983), *aff'd*, 711 F.2d 1071 (D.C. Cir. 1983); *see also Elec. Priv. Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 46 (D.D.C. 2019), *aff'd*, 995 F.3d 993 (D.C. Cir. 2021) (holding that subcommittee task groups that "did not provide advice or recommendations directly to the [agency]" were not advisory committees for FACA purposes). Here, however, the E-Bike Group consisted partially of federal officials and agency members themselves and was not subordinate to any other formalized decision-making body.  It does not matter what "level" of policymakers participated in the E-bike group, because the E-bike Group was the direct "point of contact between the public and the government."  *Ass'n of Am. Physicians & Surgeons, Inc.*, 997 F.2d at 913.

Considering all these elements together, the Court believes that the E-bike Group was an advisory committee within the meaning of FACA.  That does not mean, however, that Plaintiffs are entitled to the relief that they seek.

2.  Whether Plaintiffs are Entitled to any Relief

Defendants further argue that the notice-and-comment rulemaking process "cured" any technical FACA violation to the extent it occurred.  Defs.' Mot. at 52–54.  The cases they cite do not necessarily hold that a FACA violation can be "cured" by the rulemaking process, rather they address the appropriate remedy for a FACA violation.  In *Ctr. for Auto Safety v. Tiemann*, the court held that a violation had occurred and that the plaintiffs were entitled to summary judgment on their FACA claim but declined to invalidate a state plan approved under the allegedly tainted regulations because no prejudice had resulted and the plaintiff had even commented during the proposed rulemaking.  414 F. Supp. 215, 226 (D.D.C. 1976), *rev'd on other grounds sub nom. Ctr. for Auto Safety v. Cox*, 580 F.2d 689 (D.C. Cir. 1978).  *Nat'l Nutritional Foods Ass'n v. Califano* followed the same pattern.  *See* 603 F.2d 327, 336 (2d Cir. 1979) (holding "this to be a situation wherein Congress meant FACA to apply" but that "no court has held that a violation of FACA would invalidate a regulation adopted under otherwise appropriate procedures, simply because it stemmed from the advisory committee's recommendations . . . . We perceive no sound basis for doing so"); *see also Seattle Audubon Soc. v. Lyons*, 871 F. Supp. 1291, 1309 (W.D. Wash. 1994), *aff'd sub nom. Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401 (9th Cir. 1996) ("[O]nce a committee has served its purpose, courts generally have not invalidated the agency action even if there were earlier FACA violations.").

Here too, although a technical FACA violation occurred, it was harmless error as to the Final Rule.  Plaintiffs point to circumstantial evidence suggesting that the E-bike Committee influenced the Smith Directive, such as the timing of the meetings, which led up to the issuance of the Smith Directive and concluded shortly thereafter, and some of the draft language in the White Paper that directly foreshadows the Smith Directive.  Pls.' Reply at 30–31 (discussing

AR0560–61, the draft White Paper that suggested issuing "new policy guidance to exclude certain e-bikes from the definition of 'motor vehicle'" at 36 C.F.R. 1.4). But the Smith Directive is no longer in force for any of the parks at issue, meaning that any relief would need to relate to the Final Rule, not the Smith Directive. Particularly in light of the rulemaking process that Plaintiffs themselves participated in, the connection between the FACA violation and the Final Rule is too tenuous to set aside the Final Rule on the basis of the FACA violation or even to declare, as Plaintiffs request, that the violation improperly contributed to the Final Rule.[11] *See* Pls.' Mot. Summ. J. at 4, ECF No. 42. Accordingly, the Court denies summary judgment to the Plaintiffs on Count V.

### F.  National Environmental Policy Act (Count II)

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, "is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). It requires federal agencies to "include in every recommendation or report on . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official" evaluating the environmental impact of the proposal, 42 U.S.C. § 4332(2)(C), most commonly referred to as an Environmental Impact Statement, or EIS. Sometimes, agencies may instead "prepare a more limited document" known as an Environmental Assessment (EA), if the agency's proposed action neither is categorically

---

[11] Plaintiffs also request an injunction prohibiting future meetings of the E-bike Group, but as this Court noted in its first opinion, there is no reason to think that the E-Bike Group will reconvene, given that the group has long since disbanded and both NPS and other Interior bureaus have already issued e-bike regulations. *PEER 1*, 2021 WL 1198047, at *16. To the extent that this relief lies within the Court's power to grant, Plaintiffs have fallen far short of the necessary showing for injunctive relief.

excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004); *see also* 40 C.F.R. § 1501.5.

Not every federal action requires the preparation of an EIS or EA. The Council on Environmental Quality regulations for NEPA also direct agencies to identify in their own regulations "categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement." 40 C.F.R. § 1501.4(a). NPS has two sources for Categorical Exclusions: The Department of Interior's NEPA regulations, which are applicable to all agencies within Interior and do not require documentation, and the NPS section of the Departmental Manual, which does require documentation. AR1011–12.

Even if a Categorical Exclusion applies to a given action, the agency has an additional obligation to "evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect." 40 C.F.R. § 1501.4(b). If a Categorical Exclusion cannot be applied, the agency must prepare an EA or EIS. *Id.* at § 1501.4(b)(2). The decision to invoke a Categorical Exclusion under NEPA is reviewed under the arbitrary and capricious standard. *Nat'l Tr. for Historic Pres. in U.S. v. Dole*, 828 F.2d 776, 781 (D.C. Cir. 1987).

### 1. Whether the Smith Directive Complied with NEPA

The Smith Directive itself did not state whether NPS had conducted any NEPA analysis of any type—whether an EIS, EA, or Categorical Exclusion—before issuing the directive, AR0918–21, but NPS argues that the Smith Directive relied on 43 C.F.R. § 46.210(i), the same Categorical Exclusion later relied on in the Final Rule:

> Policies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.

Defs.' Mot. at 27 (quoting 43 C.F.R. § 46.210(i)).

Defendants argue that the lack of documentation explicitly invoking and explaining this Categorical Exclusion for the Smith Directive is not fatal, because it comes from the list in the Interior NEPA regulations that do not require documentation.  Defs.' Mot. at 28; AR1026. Defendants are correct that formal documentation for invoking a categorical exclusion is not *per se* required.  *See Back Country Horsemen of Am. v. Johanns*, 424 F. Supp. 2d 89, 99 (D.D.C. 2006) (rejecting an argument that the Forest Service's assertion of a Categorical Exclusion was "a 'post-hoc' rationalization" because "the agency had no obligation to formally document its decision" under internal guidelines).  But multiple courts have held that there must be at least some evidence that the Categorical Exclusion was in fact considered, because "[i]t is difficult . . . to determine if the application of an exclusion is arbitrary and capricious where there is no contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a Categorical Exclusion to the facts of a particular decision."  *California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002); *see also Wilderness Watch & Pub. Emps. for Env't Resp. v. Mainella*, 375 F.3d 1085, 1095 (11th Cir. 2004) (same); *Edmonds Inst. v. Babbitt*, 42 F. Supp. 2d 1, 18 n.11 (D.D.C. 1999) ("[A] post hoc assertion of a CE during litigation, unsupported by any evidence in the administrative record or elsewhere that such a determination was made at the appropriate time, cannot justify a failure to prepare either an EA or an EIS.").  The Court also registers its deep concern that there is no way of knowing whether NPS considered the presence of any exceptional circumstances before enacting the Smith Directive, as it would have been required to do before invoking the Categorical Exclusion.  *See Humane Soc. of U.S. v. Johanns*, 520 F. Supp. 2d 8, 34 (D.D.C. 2007) (holding that an agency may not "avoid NEPA review simply by *failing* even to consider

whether a normally excluded action may have a significant environmental impact" (emphasis in original)).  Nevertheless, the Court assumes that the agency did apply the Categorical Exclusion in 43 C.F.R. § 46.210(i) at the time of the Smith Directive, because in any event, it determines that its application was inappropriate here.

Beginning with the text of the Categorical Exclusion at issue, it encompasses two alternate types of policies: 1) those "that are of an administrative, financial, legal, technical, or procedural nature;" and 2) those "whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case."  43 C.F.R. § 46.210(i).  Although the Final Rule stated that it satisfied "both prongs of this categorical exclusion," 85 Fed. Reg. at 69,186, Defendants have since abandoned any attempt to argue that either the Smith Directive or the Final Rule satisfy the first alternative, Defs.' Reply at 9–10.  And with good reason—any characterization of the Smith Directive as purely "administrative, financial, legal, technical, or procedural" strains credibility.

The second alternative comes closer, but the Court remains unpersuaded that it was properly invoked.  For one thing, the environmental impacts of the Smith Directive were not too speculative "to lend themselves to meaningful analysis."  *See* 43 C.F.R. § 46.210(i).  The Smith Directive itself included multiple assertions that it considered "meaningful" impacts of the policy as a whole: the potential for e-bikes to increase bicycle access in the parks, provide new recreational opportunities, and mitigate environmental impacts of alternate forms of transportation.  AR0919.  Documents in the record suggest that analysis of those effects was possible and in fact informed the Smith Directive.  *See, e.g.*, AR1137–57 (a 2015 study reviewing trends in sales and uses of e-bikes).  The FAQ document that accompanied the Smith

Directive likewise referenced potential safety concerns and directed readers to additional research.  AR0922–25.  And Defendants' argument that no meaningful analysis of the effects of the new e-bike policy was possible is further belied by the fact that NPS has since provided a "literature review" to assist park superintendents in recertifying their decisions under the Final Rule pursuant to the Benge Memorandum.  *See* 2021 Lit. Review.[12]

NPS emphasizes the vast diversity and geography of the National Park System in support of its argument that analysis of the nation-wide impacts of the Smith Directive would not have been "meaningful," and that diversity does mean that further evaluation would be required at the individual park level.  But NPS's assertion in the Final Rule[13] that "[a]ddressing potential environmental and social impacts are most meaningful at the park level" mistakenly treats park-level analysis and national-level analysis as an either/or proposition.  *See* 85 Fed. Reg. at 69,187. The Categorical Exclusion does not excuse NEPA analysis where it would not be the "most" meaningful, only where it would not be meaningful at all.  In fact, the entire purpose of tiering in NEPA analysis is to make *both* levels of review meaningful by "incorporat[ing] by reference the general discussions of prior, broader environmental impact statements" on "site-specific environmental analyses."  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 512 (D.C. Cir. 2010).  Nor does an analysis need to answer every ambiguity or account for every variation in order to be meaningful.  "It must be remembered that the basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action before the

---

[12] The Court declines Plaintiffs' invitation to consider on the merits whether the Literature Review, which was not part of the record at the time of either the Smith Directive or the Final Rule, demonstrates any extraordinary circumstances that would preclude application of a Categorical Exclusion.  *See* Pls.' Reply at 14–15.

[13] Having no record of NPS's reasoning for invoking the Categorical Exclusion at the time of the Smith Directive, the Court is left to assume that it mirrored the reasoning in the Final Rule.

action is taken and those effects fully known." *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).  In short, further analysis of these environmental effects would have been both possible and meaningful.

The justification in the Final Rule relied heavily on the discretion of park superintendents who may choose to implement the Rule in a variety of ways.  85 Fed. Reg. 69,187 ("This rule does not require that e-bikes be allowed anywhere in the National Park System.").  As this Court already pointed out in its prior opinion, that argument does not apply to the plain terms of the Smith Directive, which required that e-bikes be allowed where traditional bicycles were allowed. *PEER 1*, 2021 WL 1198047, at *13 ("The language of the Smith Directive does not just authorize e-bike use, it makes it compulsory for those NPS parks . . . that already allowed other types of bicycles.").  Any reliance on this reasoning for the Smith Directive, to the extent it occurred, was unreasonable for that reason alone.  In addition, this reasoning in both the Smith Directive and the Final Rule commits the classic NEPA error of considering only the effects of what a policy actually, directly authorizes rather than the reasonably foreseeable impacts of a policy.  *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 17 (D.D.C. 2009) ("Defendants' failure to apply the correct standard by which to consider environmental impacts—by examining what the Final Rule authorized as opposed to the foreseeable consequences that would occur as a result of the Final Rule—is sufficient by itself to render the DOI's decision to invoke a categorical exclusion arbitrary and capricious.").  Like the agency in *Brady Campaign*, "[r]ather than performing an evaluation to ascertain the extent of any foreseeable environmental impacts," NPS appears to have "simply assumed there were none because the Final Rule did not authorize any impacts." *Id.*

Furthermore, the Categorical Exemption in 43 C.F.R. § 46.210(i) also requires that the policy "will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i). The Smith Directive instructed park superintendents to comply with NEPA when making the instructed changes to their park compendiums, but simultaneously stated that "[t]he compendium action will ordinarily fall within the categorical exclusion specified in Section 3.3.D.3 of the National Park Service NEPA Handbook." AR00921. That Categorical Exclusion is for "[m]inor changes in programs and regulations pertaining to visitor activities," AR1031, and requires the superintendent to consider whether extraordinary circumstances apply and to complete documentation to that effect. AR1034. While the Categorical Exclusions invoked on a park-by-park basis are themselves a form of NEPA compliance, both logic and the administrative record suggest that the interaction between these two Categorical Exclusions allowed NPS to avoid taking the requisite hard look required by NEPA.

The vast majority of the park units whose decisions are documented in the record[14] took the Smith Directive's invitation to invoke Categorical Exclusion D.3 from the NEPA Handbook, determining that the allowance of e-bikes would be only a minor change to visitor activities. *See* AR23044–79; AR23083–104; AR23115–36; AR23146–57; AR23163–80; AR23198–201; AR23208–19; AR23222–36; AR23242–52; AR23254–64; AR23271–77; AR23281–90;

---

[14] Some of the NEPA compliance forms in the record have been updated after the Final Rule, making it difficult for the Court to determine the extent of the parks' NEPA compliance in response to the Smith Directive, specifically. *See, e.g.*, AR23076 (summarizing the prior action in accordance with the Smith Directive and "confirm[ing] and re-designat[ing] the continued use of e-bikes in park(s) areas where bikes are currently allowed"); AR23086–87 (reaffirming the decision in September 2020); AR23146 ("The purpose of this National Environmental Policy Act analysis is to confirm and re-designate the continued use of e-bikes on park areas where bikes are currently allowed under the October 10, 2019 Superintendent's Compendium . . . ."); AR23265 ("A CE was completed for the authorization of Electric Bikes . . . back in December 2019, however since Region by way of EDQ has asked each park to redo compliance following new guidance."); AR23403–04 (reaffirming the decision in April 2020).

AR23312–19; AR23321–29; AR2332–40; AR23394–448; AR23466–69; AR23473–81;
AR23486–89; AR23495–99; AR23515–19; AR 23523–34; AR23548–619; AR23632–58;
AR23684–749; AR23755–81; AR23797–817; AR23823–841; AR23857–60; AR23869–90;
AR3898–977; AR23987–92; AR24000–03; AR24010–29; AR24040–49; AR24073–82;
AR24091–97;  AR24102–43; AR24148–73; AR24186–97; AR24217–21; AR24257–58;
AR24262–68; AR24272–89; AR24293–301; AR24322–23; AR24364–67; AR24373–74; *but see*
AR23080–82; AR23620–28; AR23782–84; AR23861–68; AR24038–39; AR24051–57;
AR24087–89; AR24225–27; AR24269–71; AR24312–14; AR24328–30; AR24368; AR24380–
85 (relying on Categorical Exemption A.8).  None appear to have prepared an EA or EIS for e-
bike use.  The documentation from some of these parks contains detailed analysis, *see, e.g.*,
AR23332–93, but most were fairly brief, utilizing the standard Categorical Exclusion form
accompanied by a checklist of potential extraordinary circumstances and an Environmental
Screening Form of potential impacts.  For the most part, the Categorical Exclusion
documentation suggests that the park superintendents relied heavily on the Smith Directive when
determining that e-bikes would not have significant impacts.  In at least two units, the entirety of
the justification section explanation was simply that "Per [the Smith Directive], this
Compendium action falls within the categorical exclusion specified in section 3.3.D.3 of the
National Park Service NEPA Handbook."  AR23056; AR24262.  Others omitted the justification
section altogether.  AR23058; AR23083; AR23171; AR23271–72.

Basically, the Smith Directive attempted to avoid conducting any environmental analysis
because the park units would do so, and the park units in turn largely declined to conduct
additional analysis because the Smith Directive had already suggested that the change was
minimal.  "The purpose and function of NEPA is satisfied if Federal agencies have considered

relevant environmental information, and the public has been informed regarding the decision-making process."  40 C.F.R. § 1500.1(a).  By invoking Categorical Exclusions at both steps, NPS fell short of these twin purposes.  Not only is that result incompatible with the purposes of NEPA, it demonstrates why the Categorical Exclusion in 43 C.F.R. § 46.210(i), which requires that the action "will later be subject to the NEPA process," was inapplicable to the Smith Directive.  *See* 43 C.F.R. § 46.210(i).  That language does not say "subject to part of the NEPA process."  NEPA is not just a box that must be checked at some point in an agency process, it is a crucial information-forcing statute designed "to provide for informed decision making and foster excellent action."  40 C.F.R. § 1500.1(a).

NPS also entirely bypassed the opportunity to consider the cumulative impacts of the Smith Directive or consider whether the sum of the e-bike policy implementation might be greater than its parts.  This approach is at odds with the principle of anti-segmentation,[15] which "ensures agencies cannot evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without a significant impact."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 301 F. Supp. 3d 50, 66 (D.D.C. 2018) (quotations and alterations omitted).  At most, the superintendents considered only the impacts of e-bike use on their individual park units, not any collective impact.  *See Fund for Animals v. Hall*, 448 F. Supp. 2d 127, 130, 132–3 (D.D.C. 2006) (finding a NEPA violation where the Fish and Wildlife

---

[15] Defendants argue that the anti-segmentation principle does not apply to Categorical Exclusions.  Defs.' Mot. at 42 (citing *Ctr. For Biological Diversity v. Salazar*, 706 F.3d 1085, 1096-97 (9th Cir. 2013)).  This is technically correct, because by definition Categorical Exclusions only apply to "actions which do not individually or cumulatively have a significant effect on the human environment."  40 C.F.R. § 1508.4 (2019).  The problem here, though, is that NPS's conclusory labeling of its e-bike policy as not having a significant effect is not a substitute for actual consideration of whether it did, particularly where there is no contemporaneous record of the agency's reasoning and the FAQs attached to the Smith Directive and later the public comments suggested that there were significant effects.

Service did not prepare an EA or EIS prior to publishing final rules that expanded recreational hunting in wildlife refuges nation-wide even though the individual refuges prepared EAs).

As the NPS NEPA Handbook admonishes, "[t]he proposed action . . . should easily fit into the category of actions described by the CE." AR1024. Assuming that NPS did contemporaneously invoke 43 C.F.R. § 46.210(i) as a Categorical Exclusion for the Smith Directive, that exclusion does not remotely fit the Smith Directive. An "agency's interpretation of the scope of one of its own [Categorical Exclusions] is 'given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation.'" *Back Country Horsemen of Am.*, 424 F. Supp. 2d at 99 (quoting *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir.1999)). Here, NPS's use of 43 C.F.R. § 46.210(i) for the Smith Directive was plainly inconsistent with the language of that provision. Defendants no longer argue that the Smith Directive was "administrative, financial, legal, technical, or procedural." The evidence before the agency demonstrated that analysis of the Smith Directive's effects, if somewhat uncertain, would be both meaningful and possible, and NPS suggested as much by directing park units to studies on relevant effects. And the Smith Directive instructed park units that the change was a minor one while blithely refusing to substantiate that position with any NEPA analysis or considering whether there might be cumulative impacts. Whatever ambiguity might be lurking in the text of 43 C.F.R. § 46.210(i), it does not save NPS's application of it here. The invocation of § 46.210(i) for the Smith Directive—if it occurred at all—was arbitrary and capricious.[16]

---

[16] This does not necessarily mean that a full EIS was required. Agencies may also prepare an EA "for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown." 40 C.F.R. § 1501.5(a). It is even theoretically possible that a different Categorical Exclusion could have properly been applied—but this one clearly was not.

2.   Whether the Final Rule Incorporated the Prior NEPA Violation

In contrast, the Final Rule did explicitly invoke 43 C.F.R. § 46.210(i), explaining that

with respect to the second prong of the categorical exclusion,[17] "this regulation's environmental

effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and

the environmental effects of allowing e-bikes in specific parks will be or have already been

subject to NEPA analysis on a park-by-park basis."  85 Fed. Reg. at 69,186.  It emphasized the

broad diversity of the national parks and the need for case-by-case consideration and noted that

while the Smith Directive had required environmental analysis from each park unit,[18] "[b]ecause

traditional bicycles were already an established presence in areas where e-bikes were recently

allowed, traditional bicycles were part of the baseline of existing conditions from which the

environmental impacts of e-bikes were measured."  *Id.*  As such, "for most units a categorical

exclusion has applied."  *Id.*

---

[17] The Final Rule also claimed to satisfy the first prong of 43 C.F.R. § 26.210, stating that "the rule is administrative, legal, and procedural in nature because it simply clarifies and codifies in regulation that superintendents have the authority to allow e-bikes in their units but does not itself take any action or require superintendents to take any action in their park units," and pointing specifically to the Smith Directive when stating that "this regulation . . . codifies the decision made in the policy memorandum but does not change the regulatory treatment of e-bikes from one established management regime to another in a way that would result in an expanded range of potential environmental impacts."  85 Fed. Reg. at 69,186.  Although Defendants now rely solely on the second prong of this categorical exclusion, this explanation further demonstrates how the Final Rule relied on the improper NEPA analysis of the Smith Directive by allowing it to redefine the baseline for changes.

[18] Plaintiffs point out that the Categorical Exclusion documentation for a significant portion of the 380 park units that authorized e-bike use consistent with the rule are not accounted for in the record.  *See* Pls.' Mot. at 21 (counting only 103 categorical exclusion forms); Defs.' Mot. at 33 (countering that the correct number is 136).  Defendants suggest that the discrepancy may be because park superintendents are not required to upload that documentation to the database that was used to prepare the record, and that others may have relied on a Categorical Exclusion that did not require any documentation or simply did not have any roads or trails at all. Defs.' Mot. at 34.  But if that information was not available to NPS or relied on by it when it implemented the Final Rule, then it was naïve at best to assume that NEPA compliance had in fact already taken place.

The Final Rule also relied in part on the Smith Directive when disagreeing with commenters who suggested that extraordinary impacts might apply. *See id.* at 69187–88 ("This rule would not have highly uncertain, and potentially significant environmental effects . . . [because] e-bikes are generally similar to impacts from bicycle use . . . . This is reinforced by the fact that most NPS units that have allowed e-bikes and have completed a site-specific NEPA review have applied a categorical exclusion."). The Final Rule also stated in conclusory fashion that it "does not establish a precedent for future action," another extraordinary circumstance that could preclude application of a Categorical Exclusion. *Id.* The Court disagrees—the Rule established a framework that could and foreseeably would be relied on for future action. And regardless, even if the Rule did not set a past precedent for expanded e-bike use, the Smith Directive surely did.

By relying on the fact that NEPA analysis that had already been "required" by the Smith Directive, and those parks' determination that a Categorical Exclusion applied, the Final Rule "used [the Smith Directive] as a false justification for a continuing NEPA violation." *PEER 1*, 2021 WL 1198047, at *14–15. Moreover, its purported explanation repeated the same errors in reasoning from the Smith Directive that the Court has detailed above. "Where superseding agency actions repeat the same alleged procedural error, they 'preserve, rather than moot, the original controversy.'" *Union of Concerned Scientists*, 711 F.2d at 379 (citation omitted). Because the Court concludes that the Final Rule preserved and relied on the Smith Directive's arbitrary and capricious use of the Categorical Exemption, it grants summary judgment to Plaintiffs on Count 2.

3. Remedy

The final question of remedy remains.  "The ordinary practice . . . is to vacate unlawful agency action, and district courts in this circuit routinely vacate agency actions taken in violation of NEPA."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 985 F.3d 1032, 1050 (D.C. Cir. 2021) (citations and quotations omitted).  But Courts also have discretion "to leave agency action in place while the decision is remanded for further explanation."  *Id.* at 1051. "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *Allied-Signal Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (quotations omitted).  "Put otherwise, this Court must determine whether there is 'at least a serious possibility that the [agency] will be able to substantiate its decision on remand,' and whether vacatur will lead to impermissibly disruptive consequences in the interim."  *WildEarth Guardians*, 368 F. Supp. 3d at 84 (quoting *Standing Rock Sioux Tribe*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017)).

Although the use of a Categorical Exclusion in the Smith Directive was an error, intervening steps taken by the agency have mitigated the seriousness of the initial error.  The Court can no longer vacate the Smith Directive, where the error actually occurred, and the only vacatur that would have any real-world consequence at this point would be of the Final Rule. The Final Rule, in contrast to the Smith Directive, now contains a discretionary standard for permitting e-bikes in each park, and the requirement that the parks which had authorized e-bikes under the Smith Directive recertify their decisions under the discretionary standard ensures that this discretionary standard universally governs park policies on e-bikes.

The record already suggests that there will likely be both positive and negative impacts of e-bikes.  The agency is required to take a hard look at them, and that analysis could potentially alter the outcome of the Final Rule, but there is "at least a serious possibility that [NPS] will be able to substantiate its decision on remand."  *See Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 97.  Nor does NPS's error necessarily require that NPS prepare a full EIS as opposed to some other form of NEPA compliance.  On remand, the agency will need to determine the proper level of NEPA compliance for the Final Rule, adequately document its reasoning, and provide opportunity for public input as appropriate.

The potential disruptive consequences of vacatur, while not particularly catastrophic, are therefore not warranted by the severity of the violation.  Park administrators and visitors alike would be newly thrust into an uncertain regulatory scheme around the use of e-bikes, and public resources would need to be expended to update park signage and guidance and re-train staff and volunteers.  The Court therefore determines in the exercise of its discretion that remand without vacatur is the appropriate remedy.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 42) is **GRANTED IN PART** with respect to the NEPA claim in Count 2 and **DENIED IN PART** in all other respects, and Defendants' Cross-Motion for Summary Judgment (ECF No. 45) is **GRANTED IN PART** with respect to Counts 1, 3, 4, and 5, and **DENIED IN PART** with respect to Count 2, and the Final Rule will be remanded without vacatur to the agency to conduct additional NEPA analysis.  Plaintiffs' Motion for Leave to File a Surreply (ECF No. 50) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 24, 2022                                        RUDOLPH CONTRERAS
                                                            United States District Judge